**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**SCOTTS VALLEY BAND OF POMO INDIANS**,
200 Columbus Parkway
Vallejo, CA 94591

Plaintiff,

v.

**UNITED STATES DEPARTMENT OF THE INTERIOR**,
1849 C Street, N.W.
Washington, D.C. 20240,

**DOUGLAS BURGUM**, in his official capacity as Secretary of the U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

and

**WILLIAM KIRKLAND**, in his official capacity as Assistant Secretary – Indian Affairs, U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

Defendants.

Case No.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. Plaintiff Scotts Valley Band of Pomo Indians ("Band") brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the Due Process Clause of the Fifth Amendment, U.S. Constitution, seeking declaratory and injunctive relief to set aside the final agency action of the Defendants the United States Department of the Interior, Secretary of the

Interior Douglas Burgum, and Assistant Secretary – Indian Affairs William Kirkland (collectively, "the Department"). The challenged agency action is the Department's July 30, 2026 decision (the "Decision," the "2026 Decision," or the "Challenged Decision"), which, upon reconsideration of a prior final determination issued in favor of the Band, concluded that certain land held in trust by the United States for the benefit of the Band does not qualify as the Band's restored lands under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2719(b)(1)(B)(iii), and therefore is not eligible for gaming. A copy of the Decision is attached as **Exhibit A**.

2. The Challenged Decision concerns approximately 160.33 acres of trust land located in the City of Vallejo, California (the "Vallejo Site"). The Department confirmed its prior conclusions that the Band qualifies as a restored tribe under IGRA, satisfies the modern connection requirement, and satisfies the temporal connection requirements of 25 C.F.R. Part 292. The Decision reverses gaming eligibility solely because it concludes that the Band failed to establish the remaining regulatory requirement—a "significant historical connection" to the Vallejo Site. *See* 25 C.F.R. § 292.12(b). In reaching that conclusion, however, the Department abandoned the analytical framework it adopted on remand from this Court and instead, in violation of the remand order, applied a materially different interpretation of IGRA and the governing regulations to substantially the same historical record.

3. On January 10, 2025, following a court-ordered remand, the Department issued a final decision (the "January 2025 Decision") concluding the Band had satisfied every element of the restored lands exception, including the significant historical connection requirement, and that the Vallejo Site therefore qualified for IGRA's restored lands exception. At the same time, the Department accepted the Vallejo Site into trust status for the benefit of the Band pursuant to Section 5 of the Indian Reorganization Act ("IRA"), 25 U.S.C. § 5108. The January 2025 Decision

therefore rendered the Vallejo Site eligible for tribal gaming under IGRA. A copy of the January 2025 Decision is attached as **Exhibit B**.

4. The January 2025 Decision issued after this Court held that the Department's 2019 restored lands opinion (the "2019 Decision") was arbitrary and capricious because it "was inconsistent with the canon of Indian construction and clear policy behind the IGRA and the restored lands exception." *Scotts Valley Band of Pomo Indians v. U.S. Dep't of the Interior*, 633 F.Supp.3d 132, 171 (D.D.C. 2022) ("*Scotts Valley I*"). A copy of the 2019 Decision is attached as **Exhibit C**. On remand, the Department complied with the Court's instructions to evaluate the historical record in light of IGRA's remedial purposes, the Indian canon of construction, and the federal government's role in disrupting the Band's historical relationship to its ancestral lands. Applying that framework, the Department concluded that the Vallejo Site satisfied the significant historical connection requirement and qualified as restored lands under IGRA. *See* January 2025 Decision.

5. On March 27, 2025, the Department issued a letter purporting to temporarily rescind the restored lands component of the January 2025 Decision during reconsideration of that decision. The Department left in place its simultaneous decision accepting the Vallejo Site into trust. Upon review of the March 2025 actions, this Court set aside the rescission as a violation of the Band's constitutional right to due process, thereby reinstating the Vallejo Site's gaming eligibility, and further held that the Department's decision to undertake reconsideration was not itself final agency action subject to judicial review. *Scotts Valley Band of Pomo Indians v. Burgum*, 808 F. Supp. 3d 1 (D.D.C. 2025) ("*Scotts Valley II*").

6. The Challenged Decision issued on July 30, 2026 at the conclusion of those reconsideration proceedings. Accordingly, this action arises directly from the Department's

implementation of this Court's decisions in *Scotts Valley I* and *Scotts Valley II* and presents the question whether the Department complied with the legal standards established in those decisions when it issued the Decision.

7. On July 31, 2026, the Band received the Challenged Decision, dated July 30, 2026. Although the Department again concluded that the Band satisfies every other regulatory requirement, it reversed its determination that the Band meets the significant historical connection requirement. Rather than applying the framework required by *Scotts Valley I*, the Decision demands an unreasonably high degree of parcel-specific proof inconsistent with *Scotts Valley I*, rejects cumulative and inferential historical evidence previously accepted by the Department, declines to draw reasonable inferences from the historical record despite acknowledging the disruptive effects of federal policies on the preservation of that record, and effectively reinstates the same analytical approach that this Court previously held in *Scotts Valley I* to be arbitrary and capricious.

8. The Decision is arbitrary, capricious, contrary to law, unsupported by the administrative record, and inconsistent with IGRA, its implementing regulations, and this Court's remand orders. The Decision, which arises from a reconsideration process that was unlawfully based on shifting and inadequate grounds, fails to provide a lawful explanation for abandoning the Department's factual findings, legal analysis, and interpretation of 25 C.F.R. Part 292 in its January 2025 Decision; disregards the Indian canon of construction and IGRA's remedial purposes; concludes for the first time in these lengthy administrative proceedings that the Vallejo Site lies outside the territory ceded under the Band's 1851 treaty, without applying the settled canon governing the interpretation of Indian treaties or addressing the treaty's express connections to Vallejo and the ceded territory; and fails to account for the Band's substantial reliance interests

arising from the Department's January 2025 Decision. The Decision therefore violates the APA, 5 U.S.C. § 706(2). The Challenged Decision also violates the Band's rights under the Due Process Clause of the Fifth Amendment.

9. *Scotts Valley I* directed the Department to evaluate the Band's evidence through the lens of historical disruption and federal responsibility. Instead, the Decision repeatedly treats the consequences of missionization, epidemic disease, forced labor, military campaigns, captivity, demographic collapse, and land dispossession, resulting directly from actions by the United States, as reasons to discount the Band's evidence. The Department thus converted historical disruption from an explanatory factor into a liability against the Band, effectively doing the exact opposite of what *Scotts Valley I* required.

10. The Decision deprives the Band of the gaming eligibility previously recognized by the Department, frustrates years of administrative and judicial proceedings, undermines the finality of agency decision-making, and threatens the Band's substantial governmental, economic, and contractual interests that arose in reliance on the Department's final January 2025 Decision. The Court should declare the Decision unlawful, set it aside, and reinstate the Department's January 2025 Decision, finding that the Vallejo Site satisfies all requirements for a restored lands determination to render it eligible for gaming by the Band under IGRA.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1362 because it is a civil action brought by a federally recognized Indian tribe arising under the Constitution, laws, or treaties of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 701-706, the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721; and the regulations implementing IGRA, 25 C.F.R. Part 292.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and (e) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendants are an agency of the United States and officers thereof acting in their official capacities.

**PARTIES**

13. Plaintiff SCOTTS VALLEY BAND OF POMO INDIANS is a federally recognized Indian tribe. *See* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 91 Fed. Reg. 4102, 4105 (Jan. 30, 2026) (listing "Scotts Valley Band of Pomo Indians of California"). The Band is the beneficial owner of the Vallejo Site that is the subject of this action, located in Vallejo, California. The Band conducts tribal government business from the Vallejo Site and maintains governmental offices in Lakeport and Concord, California. Before the Challenged Decision, the Band operated a Class II gaming facility on the Vallejo Site pursuant to the Department's January 2025 Decision, but was then compelled to suspend gaming operations upon receipt of the Decision.

14. Defendant UNITED STATES DEPARTMENT OF THE INTERIOR, the federal agency principally responsible for administering federal laws relating to Indian affairs, including IGRA and the regulations implementing IGRA, issued the Challenged Decision.

15. Defendant DOUGLAS BURGUM, in his official capacity as the Secretary of the Department, is responsible for administering federal laws governing Indian affairs, including IGRA and the regulations implementing IGRA. He is sued in his official capacity.

16. Defendant WILLIAM KIRKLAND, in his official capacity as the Assistant Secretary – Indian Affairs, issued the Challenged Decision and is responsible for administering the Department's implementation of IGRA and 25 C.F.R. Part 292. He is sued in his official capacity.

17. This action seeks judicial review of final agency action under the APA. The United States has waived sovereign immunity for this action pursuant to 5 U.S.C. § 702.

18. The Challenged Decision constitutes final agency action within the meaning of the APA because it marks the consummation of the Department's reconsideration proceedings, determines the Band's rights and obligations under IGRA, and immediately deprives the Band of the gaming eligibility previously recognized in the Department's final January 2025 Decision.

## **FACTUAL ALLEGATIONS**

### ***Background on Scotts Valley Band of Pomo Indians***

19. Scotts Valley Band of Pomo Indians is a federally recognized Indian tribe whose ancestors have lived in Northern California since time immemorial. During the nineteenth century, the Band's ancestors lived throughout the Clear Lake and North Bay regions, including in the vicinity of the present-day Vallejo Site, where they were integrated into the rancho labor economy and maintained established travel, trade, subsistence, and kinship networks connecting Clear Lake with present-day Napa, Sonoma, and Solano Counties. These longstanding historical connections form the basis of the Band's claim that it satisfies the significant historical connection requirement of IGRA's restored lands regulations.

20. In 1851, the Band entered into a treaty with the United States under which the Band agreed to cede vast tracts of land in exchange for the promise of a reservation. The ceded territory was later depicted by ethnologist Charles C. Royce in the federal government's authoritative *Indian Land Cessions in the United States* as "Royce Area 296," which encompasses the present-day Vallejo Site. The treaty and its negotiating history also reflected the parties' understanding that the Band would maintain continuing ties to the ceded territory. The negotiations contemplated that the Band's young men could continue traveling into and working within the ceded territory

after relocating to the promised reservation. The treaty further designated Vallejo as the location where the Band could obtain provisions. These contemporaneous terms, as well as the Band's previous history of extensive integration within the North Bay and Vallejo area, demonstrate that the Band and the United States understood Vallejo and the surrounding ceded territory would remain within the Band's ongoing labor, travel, and subsistence sphere. Although the treaty was signed, it was never ratified by the U.S. Senate, and no reservation was ever established. Instead, the Band became landless.

21. In 1911, the federal government acquired a small parcel of land for the Band that later became known as the Sugar Bowl Rancheria. In 1958, Congress enacted the California Rancheria Termination Act, 72 Stat. 619 (Aug. 18, 1958), terminating the federal trust relationship with the Band and extinguishing the reservation status of the Sugar Bowl Rancheria. As a result, the Band again became landless and remained so until the Department accepted the Vallejo Site into trust pursuant to the January 2025 Decision.

22. In 1986, the Band, together with other California Indian tribes, brought suit against the United States, alleging that the federal government had failed to comply with the requirements of the California Rancheria Termination Act before terminating the Band's trust relationship. The litigation was resolved through settlement, and the United States restored the Band to federal recognition effective September 5, 1991. 57 Fed. Reg. 5214 (Feb. 12, 1992). Although the Band's government-to-government relationship was restored, no reservation or trust land was restored to the Band. Consequently, despite being a restored tribe within the meaning of IGRA, the Band remained landless until the Department accepted the Vallejo Site into trust pursuant to the January 2025 Decision.

23. In order to rebuild what had been lost, in 2016 the Band applied to have the United States accept a tract of land in Vallejo, California, in trust for the Band's use as a restored homeland. The Band simultaneously requested a determination under IGRA that the land qualified as "restored lands" eligible for gaming under 25 U.S.C. § 2719(b)(1)(B)(iii). That application ultimately resulted in three restored lands decisions: the Department's 2019 Decision, denying that application, which *Scotts Valley I* set aside; the Department's final January 2025 Decision, on remand concluding that the Vallejo Site qualifies as restored lands under IGRA; and the Challenged Decision, reversing that determination following the Department's sua sponte reconsideration.

***IGRA, the Implementing Regulations, and the "Significant Historical Connection" Requirement***

24. On October 17, 1988, Congress enacted IGRA to, among other things, "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments[.]" 25 U.S.C. § 2702(1). Congress enacted IGRA to promote tribal self-determination and economic development while recognizing the federal government's unique trust relationship with Indian tribes.

25. IGRA generally authorizes Indian gaming only on "Indian lands," as defined in 25 U.S.C. § 2703(4), and prohibits gaming on lands acquired in trust after October 17, 1988, unless one of several statutory exceptions applies. 25 U.S.C. § 2719. One such exception -- the "restored lands" exception - provides that the prohibition "will not apply when ... lands are taken into trust as part of ... the restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii). The restored lands exception implements Congress's intention that Indian tribes whose federal recognition and land base were wrongfully terminated should have a meaningful opportunity both to restore their land base and realize the economic benefits associated with tribal gaming.

26. The Department, through the Bureau of Indian Affairs ("BIA"), has promulgated regulations to "articulate standards that the BIA will follow in interpreting the various exceptions to the gaming prohibitions contained in section 2719 of IGRA." Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29354 (May 20, 2008); 25 C.F.R. §§ 292.1-292.26 ("Part 292").

27. Under those regulations, an Indian tribe qualifies for the restored lands exception if it demonstrates both that it is a "restored tribe" and that the land satisfies certain regulatory criteria. An Indian tribe must have been federally recognized, subsequently have "lost its government-to-government relationship" with the United States, and later have had that relationship restored. 25 C.F.R. § 292.7(a), (b), (c). The regulations also define each of these terms. 25 C.F.R. §§ 292.8, 292.9, 292.10.

28. The regulations further require that the Band (1) be located within the same state as the lands at issue; (2) have a "modern connection" to the land; (3) have a "significant historical connection" to the land; and (4) satisfy the "temporal connection" requirement. 25 C.F.R. §§ 292.11(c), 292.12. In this case, the Department has consistently concluded that the Band satisfies the restored tribe, modern connection, and temporal connection requirements. The sole disputed issue throughout the restored lands proceedings has been whether the Band demonstrated the required significant historical connection to the Vallejo Site.

29. The regulations define a "significant historical connection" as existing where "the land is located within the boundaries of the Indian tribe's last reservation under a ratified or unratified treaty, or a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land." 25 C.F.R. § 292.2 The regulation does not require an Indian tribe to establish permanent occupancy, exclusive

occupancy, ownership, or continuous use of the precise parcel. Rather, the regulation expressly permits an Indian tribe to demonstrate a significant historical connection through historical documentation establishing villages, burial grounds, occupancy, or subsistence use in the vicinity of the land.

30. The terms "occupancy," "subsistence use," and "in the vicinity" are not defined by IGRA or Part 292 and necessarily require the Department to exercise judgment in applying the regulations to historical evidence. Because those regulatory standards are qualitative and ambiguous, they must be interpreted consistently with IGRA's remedial purposes and the Indian canon of construction. As this Court recognized in *Scotts Valley I*, where the Department applies those qualitative standards, "the canon demands that any doubt be resolved in favor of the Tribe." 633 F. Supp. 3d at 166.

31. The regulations authorize Indian tribes to request, before land is placed into trust, a determination by the Department whether a proposed trust acquisition would qualify for one of the statutory exceptions to IGRA's general prohibition on gaming on lands acquired after October 17, 1988. Such determinations, commonly called Indian Land Opinions ("ILOs"), are prepared by the Office of Indian Gaming ("OIG"), the office within the office of the Assistant Secretary-Indian Affairs ("AS-IA") principally responsible for advising the Department regarding IGRA and its implementing regulations.

32. Because the regulations define the governing legal standard for determining whether land qualifies as restored lands, the Department is obligated to apply those standards consistently and may not impose additional requirements not contained in IGRA or Part 292.

***The Department's 2019 Decision and the Court-Ordered Remand***

33. On January 29, 2016, the Band submitted a formal request for an ILO confirming that the Vallejo Site, if acquired in trust, would qualify as restored land eligible for gaming under IGRA. The request was supported by more than 4,000 pages of historical, genealogical, anthropological, and expert materials documenting the Band's connections to the Vallejo Site and surrounding North Bay region.

34. On August 11, 2016, the Band also submitted a formal trust application requesting that the Department acquire the Vallejo land in trust pursuant to Section 5 of the IRA. The Vallejo Site initially comprised approximately 128 acres, and the Band later amended its application in 2024 to include another 32 acres contiguous to the initial tract for the purpose of improving access to the parcel, for a total of approximately 160 acres, constituting the Vallejo Site. The application explained that the property would serve as the Band's homeland and support a tribal community with housing, a unified governmental headquarters, and economic ventures including a tribal gaming facility.

35. Over the following year, the Band supplemented its restored lands submission with additional expert analyses and supporting records. The Band also participated in an extensive administrative process that included several meetings and teleconferences with senior Department officials. Taken together, the Band's submissions established a substantial historical record demonstrating the Band's longstanding historical connection to the Vallejo Site and its vicinity, including evidence of the Band's participation in the ranching economy of the San Pablo Bay region; the persistent and documented presence of tribal leader Chief Augustine and other Band members who lived and worked in the vicinity of the Vallejo Site; and the Vallejo Site's location within Royce Area 296, the territory understood by the federal treaty negotiators to have been ceded by the Band's ancestors and others under the unratified 1851 treaty; the treaty negotiations'

contemplation that the Band's men could continue working within the ceded territory; and the treaty's designation of Vallejo as the location where the Band could obtain provisions.

36. Other interested parties also participated in the administrative process. In 2016, Yocha Dehe Wintun Nation and United Auburn Indian Community submitted expert reports and additional materials totaling more than 1,000 pages and, occasionally joined by Federated Indians of Graton Rancheria, engaged in a series of meetings and exchanges with the Department. The County of Solano also submitted materials in opposition to the Band's requests in 2016. From 2016-2018, the Band responded with supplemental materials, including responsive expert analyses.

37. In the 2019 Decision, the Department denied the Band's request for a favorable restored lands decision. The Department concluded that, although the Band satisfied the restored tribe, modern connection, and temporal connection regulatory requirements, it had failed to establish the required "significant historical connection" to the Vallejo Site.

38. In its 2022 decision in *Scotts Valley I*, this Court held the Department's denial of the Band's restored land request was arbitrary and capricious when measured against the Indian canon of construction and the policy underlying IGRA and the restored lands exception. *Scotts Valley I*, 633 F. Supp. 3d at 171.

39. The Court held that the Department's analysis improperly discounted important aspects of the administrative record by failing to adequately consider the Band's evidence in light of the historical circumstances that rendered the Band landless, the federal government's responsibility for those circumstances, and the remedial purpose underlying IGRA's restored lands exception. *Scotts Valley I* at 166-67. The Court concluded that the Department acknowledged evidence demonstrating the Band's historical presence in the vicinity of the Vallejo Site—including evidence concerning Chief Augustine, other Band members, and the Band's presence in the area—

"but then chose to devalue" or failed to draw reasonable inferences from that evidence. *Id.* at 167-68.

40. The Court held that the Indian canon of construction governs the Department's interpretation and application of the restored lands regulations because those regulations implement a statute enacted for the benefit of Indian tribes. *Scotts Valley I* at 166. The Court recognized that the significant historical connection standard requires the Department to apply qualitative and inherently ambiguous concepts, including "occupancy" and "vicinity," to historical evidence. Under those circumstances, any doubt must be resolved in favor of the Band. *Scotts Valley I*, 633 F. Supp. 3d at 166-68. The Court further held that the canon applies notwithstanding objections from competing tribes whose gaming operations might face additional economic competition, rejecting arguments that the canon should yield because another Indian tribe might experience increased gaming competition: such a result would frustrate both IGRA's remedial purposes and the Indian canon itself. *Id.* at 167-68.

41. The Court vacated the Department's restored lands determination and remanded the matter to the Department for further proceedings consistent with its opinion. The Court did not direct the Department to reopen the administrative record, solicit new historical evidence, or reconsider issues beyond those identified in its opinion. Instead, the remand required the Department to reevaluate the existing administrative record using the analytical framework prescribed by the Court—that is, one that properly accounted for IGRA's remedial purposes, the Indian canon of construction, the historical circumstances underlying the Band's landless status, and reasonable inferences supported by the historical record.

42. The Court did not hold that the Department was required to reach any particular result on remand. Rather, it required the Department to apply the proper legal framework in

evaluating the existing historical record, leaving it to the Department whether to reopen the voluminous administrative record. Whether the Department complied with that mandated framework in the Challenged Decision or abandoned it is the central issue presented in this action.

***The Department's January 2025 Decision on Remand***

43. On remand, the Department reconsidered the Band's restored lands request in accordance with the Court's decision in *Scotts Valley I*. The Department based its renewed review exclusively on the existing comprehensive administrative record, which included extensive historical, genealogical, expert, and documentary evidence submitted by the Band and other interested parties, together with publicly available materials. Consistent with the Court's remand, the Department did not reopen the administrative record or solicit additional evidentiary submissions from any party.

44. On January 10, 2025, after nearly a decade of administrative proceedings and litigation, the Department issued a final decision. In that decision, the Department accepted the Vallejo Site into trust for the benefit of the Band pursuant to Section 5 of the IRA and 25 C.F.R. Part 151. The Department further concluded that the Vallejo Site qualified as "restored lands" under IGRA and determined that the Band could conduct gaming on the Vallejo Site. That determination represented the Department's considered application of this Court's remand instructions to the existing administrative record.

45. The Department expressly recognized that the only new considerations identified by this Court's remand order were: "(1) the historical circumstances underlying the Band's landless status; and (2) the policy underlying IGRA and the restored lands exception." January 2025 Decision at 2. The Department therefore evaluated the existing historical record through the analytical framework prescribed by *Scotts Valley I*.

46. Applying the Court's guidance, the Department concluded that Congress "intended for the restored lands exception 'to be read broadly,' in service of IGRA's overall goal of 'promoting tribal economic development and self-sufficiency.'" January 2025 Decision at 19. Accordingly, the Department adopted "broad understandings of the terms 'occupancy' and 'vicinity' in the definition of 'significant historical connection' in Part 292." *Id.* at 19-20. The Department recognized that the regulations require an evaluation of the historical record consistent with IGRA's remedial purposes.

47. Applying those principles to the historical record, the Department concluded that the Band had established a significant historical connection to the Vallejo Site. In reaching that conclusion, the Department evaluated the historical record cumulatively rather than weighing elements of it in isolation. Among other things, the Department relied upon evidence demonstrating the Band's historical presence throughout the North Bay region, including evidence concerning Chief Augustine, the Band's participation in the regional ranching economy, the proximity of Mission San Francisco Solano and Napa to the Vallejo Site, and the Vallejo Site's location within Royce Area 296—the territory ceded by the Band's ancestors under the 1851 treaty with the United States. While the Department acknowledged only Chief Augustine's "possible baptism" at Mission San Francisco Solano, it nevertheless concluded that all of this evidence, viewed in its totality and in light of the Indian canon of construction and IGRA's remedial purpose, satisfied the regulatory requirements for restored lands eligibility. *Id.* at 19-21.

48. The January 2025 Decision's reliance on Royce Area 296 was consistent with the treaty and its negotiating history. The Royce map, a central piece of evidence in the Administrative Record, reflects the territory the federal representatives understood to have been ceded. The federal negotiator assured the Band that its men could continue traveling into and working within that

territory and the treaty designated Vallejo as the location where the Band could obtain provisions. Those contemporaneous materials corroborated the broader historical evidence of the Band's labor, travel, subsistence, and other connections throughout the North Bay and provided direct evidence connecting the Band to Vallejo and the surrounding ceded territory.

49. The Department therefore reversed its 2019 Decision and concluded that the Band satisfied every element of the restored lands exception, including the requirement of a significant historical connection. January 2025 Decision at 23. In doing so, the Department expressly adopted the analytical framework required by *Scotts Valley I* and concluded that the existing administrative record satisfied Part 292 when interpreted consistently with IGRA's remedial purposes and the Indian canon of construction.

50. The January 2025 Decision, combining both a trust lands acquisition and an IGRA gaming eligibility determination with respect to those lands, achieved a singular objective of economic self-sufficiency through tribal government gaming under IGRA.

51. The January 2025 Decision marked a historic milestone for the Band. For the first time in nearly seventy years, the Band again possessed trust land. For the first time since its restoration to federal recognition, the Band possessed trust land eligible for gaming under IGRA, allowing it to pursue the governmental, economic development, and self-sufficiency objectives that Congress promoted through IGRA's restored lands exception. The Department's final determination also created substantial reliance interests that are described more fully below.

52. The January 2025 Decision did not merely reach a different outcome than the Department's 2019 Decision. It adopted a different analytical framework for evaluating the significant historical connection requirement—one that gave effect to this Court's remand instructions: interpreting Part 292 consistently with IGRA's remedial purposes, evaluating the

historical evidence cumulatively, and drawing reasonable inferences from the administrative record. While the Department acknowledges and at times purports to comply with that framework in the challenged Decision, it in fact abandons that framework and substitutes it with one that arbitrarily and unlawfully departs from this Court's remand instructions.

***The Department's March 2025 Rescission and Reconsideration Actions***

53. On March 27, 2025, following consultation with non-applicant tribes opposed to the Band, but not the Band itself, the Department issued a letter purporting to temporarily rescind its restored-lands component of its January 2025 Decision and reopen consideration of the Vallejo Site's eligibility for gaming under IGRA. The Department asserted that reconsideration was warranted because it had not considered additional materials submitted by the Band's opponents after this Court's 2022 remand in *Scotts Valley I*. The Department did not identify any error in its January 2025 Decision concerning the legal framework prescribed by *Scotts Valley I*, nor did it conclude that the January 2025 Decision had misapplied IGRA or Part 292.

54. Before issuing the March 27, 2025, letter, the Department did not provide the Band with notice or an opportunity to be heard. Only after issuing the rescission did the Department invite the Band and other interested parties to submit evidence and legal analysis on whether the Vallejo Site qualifies as restored lands under 25 U.S.C. § 2719(b)(1)(B)(iii) and 25 C.F.R. Part 292. The Department initially established May 20, 2025, as the submission deadline, later extending it to June 13, 2025.

55. The additional materials prompting reconsideration consisted primarily of submissions from Indian tribes opposing the Band's project, whose established tribal gaming operations would face additional competition if the Vallejo Site remained eligible for gaming. Those tribes had actively participated in the original administrative proceedings leading to the

Department's 2019 Decision. At various times following the Court's 2022 remand in *Scotts Valley I*, those tribes submitted additional expert reports and historical analysis outside the administrative record considered by the Department in issuing its January 2025 Decision. Because the Department elected to resolve the remand from this Court on the existing administrative record, those post-remand submissions were not considered in the January 2025 Decision.

56. The complete record of materials submitted after the Court's 2022 remand remains unknown to the Band, in part because the Department has not substantively responded to the Band's request seeking copies of these submissions. The Department has never produced or identified those purportedly omitted submissions, and as such, the Band and this Court have no way of determining which documents the Department believed had been overlooked, or whether they could have justified reopening and reversing the January 2025 Decision.

57. In addition to pressing the Department for reconsideration, the tribal opponents also filed actions for judicial review of the January 2025 Decision. *See Lytton Rancheria of California v. U.S. Dep't of Interior*, No. 25-cv-01088-TNM (D.D.C., filed Apr. 10, 2025); *United Auburn Indian Cmty. v. U.S. Dep't of Interior*, No. 25-cv-00873-TNM (D.D.C., filed Mar. 24, 2025); and *Yocha Dehe Wintun Nation, et al. v. U.S. Dep't of Interior*, No. 25-cv-00867-TNM (D.D.C., filed Mar. 24, 2025). This Court stayed each of these actions pending the outcome of the Department's reconsideration.

58. The Department's March 27, 2025 rescission of the January 2025 Decision immediately disrupted the Band's governmental and economic development efforts and undermined the certainty and finality of that Decision. It cast substantial uncertainty over the finality of that Decision, complicated and jeopardized the Band's negotiations with the City of Vallejo and the State of California, affected financing and project planning, and undermined

regulatory approvals and governmental actions that had already been undertaken by the Band in reliance on the final January 2025 Decision.

59. Notwithstanding the reconsideration proceedings, the Department never asserted that this Court's decision in *Scotts Valley I* had been superseded or that the legal framework governing the restored lands analysis had changed. Throughout the reconsideration proceedings, the Department remained obligated to evaluate the Band's restored lands request consistently with this Court's remand instructions, IGRA, and Part 292.

***The Band's Challenge to the March 2025 Actions***

60. The Band promptly filed suit challenging both of the Department's March 27, 2025 actions—the temporary rescission of the January 2025 Decision and the Department's decision to undertake administrative reconsideration. *Scotts Valley Band of Pomo Indians v. Burgum*, No. 25-cv-00958 (TNM) (D.D.C., Compl. filed Apr. 1, 2025).

61. On October 30, 2025, the Court issued a decision in *Scotts Valley II*, 808 F. Supp. 3d 1. The Court held the Department's decision to undertake reconsideration marked only the beginning of the agency's decision-making process and therefore did not constitute final agency action subject to judicial review. *Scotts Valley II*, 808 F. Supp. 3d at 13-14.

62. The Court reached a different conclusion with respect to the Department's temporary rescission of the January 2025 Decision. *Scotts Valley II*, 808 F. Supp. 3d at 14-16. Reviewing the rescission as a final agency action, the Court held the Band possessed a constitutionally protected property interest in the gaming eligibility determination. *Id.* at 16-23. Once the Department accepted the Vallejo Site into trust and determined that it was eligible for gaming, the Band acquired a property interest protected by the Due Process Clause. The Court concluded that the Department violated the Fifth Amendment by rescinding that determination

without providing the Band with notice of the proposed action, the reasons supporting it, or an opportunity to be heard. Accordingly, the Court vacated the rescission, thereby restoring the Vallejo Site's eligibility for gaming under the January 2025 Decision while permitting the Department's reconsideration proceedings to continue. Nothing in Scotts Valley II authorized the Department to depart from the legal framework established in Scotts Valley I as the law of the case or relieved the Department of its obligation to comply with IGRA, Part 292, and the APA in issuing any final decision on reconsideration.

63. Accordingly, after *Scotts Valley II*, the Department remained free to engage in reconsideration proceedings, but any final decision to reconsider and the result of those proceedings remained subject to judicial review under the APA and was required to comply with this Court's remand instructions in *Scotts Valley I*, the governing requirements of IGRA and Part 292, and the constitutional protections recognized in *Scotts Valley II*.

***The Department's Reconsideration Proceedings***

**A. Continuation and Scope of Reconsideration**

64. While *Scotts Valley II* was pending, the Band repeatedly objected to the Department's reconsideration process and requested procedural safeguards designed to ensure transparency, parity of participation, compliance with due process, and adherence to the legal framework governing the restored lands analysis.

65. On December 3, 2025, after the *Scotts Valley II* litigation concluded, the Department notified the Band in writing of its intention to continue the reconsideration proceedings. The Department advised that it had accepted submissions of "evidence and/or legal analysis" from interested parties "regarding whether the Vallejo Site qualifies as restored lands under 25 U.S.C. § 2719(b)(1)(B)(iii) and 25 C.F.R. Part 292".

66. The Department identified a specific basis for continuing reconsideration. In a letter from Assistant Secretary Kirkland, the Department stated that the January 2025 Decision had not considered submissions received after this Court's 2022 remand in *Scotts Valley I* and expressed concern that "not taking those submissions into consideration in this particular case could be deemed legal error." The asserted defect therefore concerned materials submitted after the remand but before the Department issued the January 2025 Decision. The Department declined to identify the nature of the claimed legal error or to meet with the Band to discuss it.

67. The Department further stated that those "submissions raise questions about the Band's significant historical connection and temporal connection to the Vallejo Site." It advised that it would provide the submissions to the Band so that the Band would have notice of the evidence and legal analysis being added to the reconsideration record and initially gave the Band until January 30, 2026, to respond.

**B. The Department Shifts the Stated Basis for Reconsideration**

68. Representatives of the Band met with Department officials on December 22, 2025, and followed up with a letter emphasizing that the Department retained discretion to discontinue the reconsideration process and instead defend its January 2025 Decision in the pending federal litigation challenging that decision. The Band further argued that continued reconsideration risked compounding the due process defects identified by the Court, particularly where the Department had engaged in *ex parte* communications with economic competitors and appeared to be expanding the scope of reconsideration beyond its originally stated rationale. The Band requested a cooperative process to establish a reasonable schedule that would allow meaningful review of any expanded record and stressed that any reconsideration must comply with both the *Scotts Valley I*

remand decision governing the restored lands analysis and the *Scotts Valley II* ruling recognizing the Band's protected property interest and heightened procedural protections.

69. The Band also raised practical concerns regarding the proposed January 30, 2026, submission deadline, explaining that meaningful expert review of newly submitted materials would require additional time and that proceeding under a compressed schedule would create an unfair, asymmetrical process favoring opponents who had already spent months to prepare new analyses. The Band therefore requested that the Department work collaboratively with the Band to develop an appropriate schedule while continuing discussions regarding whether reconsideration should proceed at all.

70. On January 21, 2026, by letter to the Band, the Department extended the Band's response deadline to May 1, 2026. The Department did not entertain discussion about whether the reconsideration should continue. The Department also added, to "narrow the focus" of the Band's response, that the "Department does not consider documents submitted by third parties between September 30, 2022 (the date of the remand of the 2019 Gaming Eligibility Determination) and January 10, 2025 (the date of the 2025 Gaming Eligibility Determination) to be part of the record for the Department's current reconsideration." Opponents were required to resubmit any such documents to have them considered by the Department.

71. The Department did not explain the change between its December 3, 2025 and January 21, 2026 positions. If reconsideration was warranted because the January 2025 Decision failed to consider submissions made after the Court's remand but before the Department's decision on remand was issued, the Department did not explain why those submissions were subsequently excluded from the reconsideration record unless resubmitted. Conversely, if the June 2025 submissions were the proper focus of reconsideration, the Department did not explain how

submissions made after the January 2025 Decision established that the earlier decision contained legal error.

72. The disconnect was particularly significant because portions of the June 2025 submissions did not exist when the January 2025 Decision issued. These materials could not have been among the submissions that the Department allegedly should have considered before issuing that decision. The Department did not explain how evidence created after January 10, 2025, could possibly bear upon its stated concern that the Department had failed to consider materials that should have been before it when it reached that Decision.

73. The June 2025 submissions also afforded the opposing tribes an opportunity to respond directly to the already final January 2025 Decision. With the benefit of that Decision, the opponents could refine prior arguments, target the Department's factual findings and legal analysis, submit new expert reports and declarations, and present additional advocacy specifically designed to overturn the favorable determination. The Department did not explain why permitting renewed advocacy was necessary to remedy the procedural concern identified in its December 3, 2025 notice or how it was consistent with the finality ordinarily afforded an agency decision issued following a judicial remand.

74. The Department therefore never articulated a coherent connection between the asserted defect that prompted reconsideration and the administrative process it ultimately conducted. Nor did it explain why newly created evidence or refined advocacy directed at the January 2025 Decision justified reopening a completed remand determination.

**C. The Band's Evidentiary and Legal Response**

75. On April 17, 2026, the Band and its counsel met with Department officials to provide an advance overview of the Band's forthcoming submission. During that meeting, the

Band identified the experts it had retained, summarized the principal conclusions of their analyses, addressed the deficiencies in the opposing tribes' submissions, and outlined the legal framework governing the Department's reconsideration. The Band's lead expert, Dr. Hurtado, attended the meeting with the Band to make himself available for any questions; none were forthcoming.

76. On May 1, 2026, the Band submitted its formal response to the Department. The submission included five reports prepared by six historians, anthropologists, and ethnohistorians. The Band's experts analyzed both the historical record previously considered by the Department and additional evidence responsive to the materials submitted by opposing tribes.

77. The Band also submitted a legal analysis explaining why the historical record establishes a significant historical connection between the Band and the Vallejo Site under 25 C.F.R. § 292.12(b).

78. The Band's submission demonstrated, among other things, the repeated movement of the Band's ancestors into the North Bay; their participation in the regional rancho labor economy; their use of established travel, trade, subsistence, and kinship networks linking Clear Lake to Vallejo and surrounding areas; and continuity of those ties over time.

79. The Band's experts also addressed the historical forces that disrupted Native communities and consequently fragmented the documentary record, including missionization, disease, displacement, forced labor, and the movement and resettlement of Native populations throughout the North Bay. The submission explained that these historical circumstances must be considered when evaluating the nature and quality of the surviving evidence of occupancy and use.

80. The Band's 2026 submissions strengthened and reinforced the evidence relied upon in the January 2025 Decision. They responded directly to the opposing tribes' arguments concerning the 1837 baptismal cohort, Chief Augustine, Rancho Tulucay, Rancho Suscol, regional

labor patterns, intermarriage, travel and trade networks, Royce Area 296, and the identity and movement of Native communities within the North Bay.

81. The Band's experts further explained that historical patterns of travel for labor, trade, ceremony, and subsistence comprise the relevant historical footprint for evaluating "occupancy" and "vicinity" under Part 292. They explained why the Band's documented residence and labor elsewhere in the North Bay supported a reasonable inference of use and occupancy in the vicinity of the Vallejo Site, including Rancho Suscol, where the Vallejo Site is located.

82. The Band's experts also reported that the Vallejo Site was not historically located within Southern Patwin territory, as opponents had argued. Rather, other tribal communities had existed there, before they were relocated to missions, leaving the Vallejo Site empty of its original inhabitants by 1810.

83. The Band also presented evidence supporting reliance on Royce Area 296 as evidence of historical connection. The Band explained that Charles Royce's depiction reflected the territory the federal treaty negotiators understood to have been ceded under the Band's 1851 treaty and remained probative under Part 292 even if other Native communities also maintained historical connections to portions of the depicted area. The Band further explained that the treaty negotiations contemplated that the Band's men could continue traveling into and working within the ceded territory after relocating to the promised reservation and that the treaty designated Vallejo as the location where the Band could obtain provisions. Those terms directly corroborated the Band's continuing labor, travel, and subsistence connections to Vallejo and the surrounding ceded territory.

84. The Band further explained that the treaty and its negotiating history must be interpreted from the perspective of the Indian signatories. Under the settled Indian canon, treaties

are construed as the tribal parties would naturally have understood them, with ambiguities and doubtful expressions resolved in their favor. The relevant inquiry therefore was not whether the Band possessed exclusive ownership of, or exclusive authority to cede, every acre depicted in Royce Area 296, but how the Band and the federal negotiators understood the ceded territory and the Band's continuing relationship to it.

85. The Band further demonstrated that Part 292 does not require proof of exclusive occupancy, superior title, permanent settlement, or direct evidence that the Band used the precise parcel in question. Rather, the regulation permits a significant historical connection to be established through historical documentation of villages, burial grounds, occupancy, or subsistence use "in the vicinity of the land" supporting an inference of use of the specific parcel.

86. The Band's submission also argued that the Department's stated basis for reconsidering the January 2025 Decision was legally erroneous. Specifically, the Band explained that the Department's prior discretionary decision not to reopen the record following *Scotts Valley I* was eminently reasonable, consistent with the Court's remand, and could not itself constitute legal error. The Department had never explained how its decision to resolve the remand on the existing administrative record amounted to an abuse of discretion. The Band therefore argued that the Department's decision to revisit the Vallejo Site's gaming eligibility lacked a reasonable basis and was arbitrary and capricious under the APA.

87. The Band further explained that the procedural posture of the case constrained the Department's authority on reconsideration. In issuing both the January 2025 Decision, and in the subsequent Challenged Decision on reconsideration, the Department remained bound by this Court's remand in *Scotts Valley I*. The Band therefore argued that, absent further judicial direction or a reasoned explanation consistent with the APA, the Department could not lawfully abandon

the analytical framework required by *Scotts Valley I*, alter its completed remand determination, or undermine the finality of the agency action taken in compliance with a binding judicial remand.

88. The Band maintained that the January 2025 Decision faithfully applied the District Court's remand instructions, correctly applied the Indian canon of construction and the remedial purposes of IGRA, rested on substantial evidence contained in the administrative record, and could not lawfully be reversed absent a reasoned explanation consistent with the APA.

***The Department's July 30, 2026, Decision on Reconsideration: The Challenged Decision***

**A. The Decision Reaffirms Three of the Four Regulatory Requirements**

89. On July 31, 2026, the Department provided the Band with the final Decision on reconsideration, dated July 30, 2026. The Decision reversed the Department's January 2025 Decision and concluded that the Vallejo Site does not qualify as restored lands under IGRA.

90. The Decision nevertheless reaffirmed that the Band satisfies three of the four regulatory requirements governing the restored lands exception. Specifically, the Department again concluded that the Band qualifies as a restored tribe, satisfies the modern connection requirement, and satisfies the temporal connection requirement. Decision at 5-9.

91. Accordingly, the Decision denied gaming eligibility solely because it concluded that the Band failed to establish the remaining regulatory requirement—a significant historical connection to the Vallejo Site under 25 C.F.R. §§ 292.2 and 292.12.

92. In analyzing the significant historical connection requirement, the Decision resolves three principal factual disputes. First, it concludes that the individuals baptized in 1837 at Mission San Francisco Solano were not ancestors of the Band, including the individual identified as Agustín. Decision at 31-32. Second, the Decision concludes, again, that Chief Augustine and other Band ancestors worked on ranchos throughout the North Bay Region. Indeed, the Decision

finds that "Augustine's residence in Napa in the 1870s constituted occupancy, as defined in the 2025 ILO," and that "that occupancy is attributable to the Band as a whole." Decision at 32-33. Third, the Decision concludes, for the first time in the lengthy administrative proceedings, that the Vallejo Site is not located in territory ceded by the Band in the 1851 treaty. Decision at 33.

**B. Rejection of the Royce Map Fails to Apply the Required Analytical Framework**

93. In an unprecedented conclusion, the Decision rejects reliance on Royce Area 296 even while acknowledging that the Royce map may accurately reflect the territory the federal treaty negotiators understood the Band to be ceding. Decision at 33. The Decision instead reasons that reliance on the map would be "unfair" to successors of other Native communities that may also have occupied portions of the depicted territory but did not participate in the treaty negotiations.

94. That reasoning substitutes an exclusivity and title-based inquiry for the historical-connection inquiry required by Part 292. The relevant issue is whether the treaty, its negotiations, and the federal government's contemporaneous depiction, provide historical evidence of the Band's connection to the Vallejo Site and its vicinity—not whether the Band possessed exclusive ownership of, or exclusive authority to cede, every acre depicted in Royce Area 296.

95. The Decision also fails to apply the settled canon governing Indian treaties. Indian treaties must be construed as the tribal signatories would naturally have understood them, with ambiguities and doubtful expressions resolved in their favor. The Decision does not evaluate how the Band's ancestors understood the ceded territory or address the negotiations' contemplation that members of the Band could continue traveling into and working within that territory.

96. The Department's new finding therefore disregards the federal negotiators' contemporaneous understanding, fails to consider how the Band's ancestors would have

understood the treaty, and discounts express treaty and negotiating evidence demonstrating the Band's continuing labor and subsistence connections to Vallejo and the ceded territory.

97. Nor does the Decision reconcile its new conclusion with the treaty's express designation of Vallejo as the location where the Band could obtain provisions. That provision directly connected the Band to Vallejo and reflected the parties' understanding that Vallejo fell within the territorial and subsistence framework memorialized by the treaty. Reverting to the 2019 Decision's view that the designation of a Vallejo location was merely for the federal government's convenience, the Decision fails to contend with the body of evidence demonstrating that the treaty's pick-up designation, like the government's desire to have the Band cede the land depicted in Royce Area 296, is part of a larger pattern of consistent, ongoing connections to the vicinity of the Vallejo Site, most of which naturally went undocumented by official recordkeepers.

98. The Department's dismissal of Royce Area 296 reflects a misunderstanding of the historical role Royce's work has played in federal Indian law. For more than a century, the federal government has relied on the *Indian Land Cessions in the United States* as the authoritative depiction of treaty cession boundaries. The Indian Claims Commission—the federal tribunal created by Congress in 1946 to adjudicate Indian land claims—described Royce's work as an "indispensable reference for all subsequent students of Indian land areas" because it translated "the often vague treaty calls into precise boundaries." The Commission likewise recognized that Royce's maps were not intended to establish the precise extent of an Indian tribe's ownership or exclusive occupancy of every parcel within a ceded area. Rather, Royce mapped treaty cessions, while questions of ownership were resolved through historical, anthropological, and ethnographic evidence. The Decision therefore erred by discounting Royce Area 296 because it did not, in the

Department's view, accurately reflect ownership of the area. That is not the function Royce's maps have ever served in federal Indian law.

99. The Department has consistently relied on Royce Area 296 as reliable evidence of the territory ceded by the Band's ancestors. In the 2019 and 2025 decisions, the location of the Vallejo Site within Area 296 created a favorable inference of the Band's occupation of the Vallejo Site. In a separate 2012 decision by the Department on the Band's restored lands application for a different parcel of land, one of the grounds for denying that application was the parcel's location outside of Area 296. Because the parcel was outside Area 296, the Department found the parcel was undisputedly "outside of that ceded territory." The Band relied on that 2012 determination to focus its efforts on a site within Area 296. It is inequitable for the Department now to find that the Royce map is unreliable as a basis for the denial in the Challenged Decision, and the doctrine of equitable estoppel bars the Department from making that finding.

### C. By Refusing to Draw Inferences Favorable to the Band, the Department Failed to Apply the Required Analytical Framework

100. The Decision's discussion of inferences effectively reinstates the analytical approach of the 2019 Decision that *Scotts Valley I* identified as arbitrary and capricious. It departs from the standards that IGRA and *Scotts Valley I* require, instead approaching the matter as a black-or-white, true-or-not, assessment, stripped of all historical context. This refusal to acknowledge possibilities, and to instead insist upon certainties, is inconsistent with the established legal framework built on historical context and inferences from the available documents. The Decision instead wrongly demands forms of documentary proof that the historical record demonstrates were disrupted by missionization, epidemic disease, forced labor, captivity, violence, and dispossession.

101. Having rejected both the Band's evidence concerning the 1837 baptismal cohort and the Vallejo Site's location within the treaty-ceded territory, the Decision concludes that the record does not establish the Band's "occupancy or subsistence use in the vicinity of the [Vallejo Site.]" Decision at 34 (quoting 25 C.F.R. § 292.2). In reaching that conclusion, however, the Decision abandons the broader understanding of the term "vicinity" adopted in the January 2025 Decision and instead applies a more restricted interpretation, requiring an "inference of historic use or occupancy *on the Parcel itself*," while setting an unreasonably high bar for any such inference, in violation of the standards that govern the implementation of the restored lands criteria under *Scotts Valley I*. *Id.* at 35 (emphasis added).

102. The Decision likewise adopts an unexplained and historically inaccurate understanding of "subsistence use." Rather than considering the Band's documented participation in the North Bay ranching economy as evidence of subsistence within the meaning of Part 292, the Decision effectively limits subsistence to traditional pre-contact practices. The Decision nowhere explains why Indians who supported themselves through ranch labor after the disruption of their traditional economy were no longer engaged in "subsistence use," notwithstanding the historical circumstances that *Scotts Valley I* required the Department to consider.

103. Applying the narrower standards, the Decision declines to infer a significant historical connection from the Vallejo Site's location within the Royce Area 296; the federal treaty negotiators' contemporaneous understanding of the ceded territory; the negotiators' contemplation that members of the Band could continue to work within that territory; the treaty's designation of Vallejo as the location where the Band could obtain provisions; evidence that Native people likely worked on Rancho Suscol; the Band's documented participation in the regional rancho labor economy; or the Band's established travel, trade, subsistence, and kinship networks throughout the

North Bay. *Id.* at 35-36. The Decision discounts the fact that Indians worked on Rancho Suscol. Those Indians may not have included the Band's ancestors because, the Decision finds, Patwins were also present, and the references in the historical record to "Clear Lake Indians" in the area might not have meant the specific Clear Lake Indians who were the Band's ancestors. *Id.* at 36-37. The Decision suggests, in mockery of this Court's 2022 remand order in *Scotts Valley I*, that if the Band is to "attain a different result," it should not have been so completely dispersed, and perhaps its connections would be more abundantly documented. *Id.* at 37 (quoting *Scotts Valley I*, 633 F. Supp. 3d at 167). Relying on an asserted lack of evidence to the contrary, the Decision finds Rancho Suscol was uniquely "different from other ranchos in the region," in that it alone was never home to the Band's ancestors as a labor force. *Id.* at 37-38. The Decision takes final shots at the Band's evidence of intermarriage and trade networks as indicia of the Band's historical connections to the North Bay, declining to infer any connection to the Vallejo Site in the North Bay. *Id.* at 38 & n.314.

104. And although the Decision concludes that the Band's ancestors "worked, resided, and died on North Bay ranches and farms" it nevertheless concludes that those facts do not give rise to a natural inference that they used the [Vallejo Site]. Decision at 39. Likewise, although the Decision recognizes that Chief Augustine's residence in Napa constituted "occupancy" attributable to the Band as a whole, it declines to infer that such occupancy demonstrates occupancy or use in the vicinity of the Vallejo Site.

105. The "problem" with the Band's evidence is "qualitative," the Decision notes in closing. Decision at 39. Indeed, it would have to be, the *Scotts Valley I* remand order indicates, "as the agency lacks quantitative standards to apply." *Scotts Valley I*, 633 F. Supp. 3d at 166. The remand order held, "that is exactly when the [Indian] canon demands that any doubt be resolved

in favor of the Tribe." *Id.* The Decision nevertheless resolved that acknowledged qualitative uncertainty against the Band at every turn, abandoning the analytical framework correctly adopted in the January 2025 Decision and mandated by this Court's decision in *Scotts Valley I.*

106. The Decision thus reaches its adverse conclusion by turning away from the judicially mandated analytical framework that (1) resolves doubts in favor of the Band; (2) gives fair consideration to the historical circumstances that severed the Band's connection to its land and left the Band in a comparatively disadvantageous position, and (3) implements a statute that Congress intended to provide some recompense to the Band.

107. The Decision constitutes final agency action subject to judicial review under the APA. It marks the consummation of the agency's decision-making process and determines the parties' rights and obligations by concluding that the Vallejo Site is not eligible for gaming under IGRA. The Decision immediately deprives the Band of the gaming eligibility recognized in the January 2025 Decision, and substantially impairs the Band's constitutionally protected property interest in that determination, and inflicts immediate and ongoing governmental, economic, and sovereign injury upon the Band.

108. In 2022, this Court held that the 2019 Decision was arbitrary and capricious because Interior failed to adequately account for IGRA's remedial purposes, the restored lands exception, and the federal government's role in severing the Band's connections to land. The January 2025 Decision expressly corrected those errors and granted the determination, but the Challenged Decision repeats exactly the same errors and returns to reasoning very similar to the unlawful 2019 Decision: demanding more parcel-specific evidence, discounting evidence of displacement, discounting regional occupancy, and discounting inferential evidence.

### *Effects of the Challenged Decision*

109. The Band reasonably relied upon the finality of the January 2025 Decision. During the period that decision was in effect – before the Department's unlawful recission – the Band submitted its gaming ordinance to the National Indian Gaming Commission ("NIGC"), which approved the ordinance on March 25, 2025, confirming the Band's eligibility to conduct gaming on the Vallejo Site under IGRA.

110. After this Court set aside the rescission in *Scotts Valley II*, while the January 2025 Decision remained in effect, the Band resumed implementation of its gaming project pursuant to the Department's restored lands determination and the rights recognized therein.

111. Acting pursuant to the rights recognized in the January 2025 Decision, the Band developed and commenced operation of a Class II gaming facility (the "Preview Casino") on a portion of the Vallejo Site as a preview of its planned Class III gaming facility.

112. To develop and operate the Preview Casino, the Band entered an agreement with the City of Vallejo to pay the City for making public safety services such as law enforcement and fire protection available to the Class II facility, and to establish connections to City utilities.

113. The Band also provided formal notice to the NIGC of its intent to issue a facility license for the Preview Casino. The Band's gaming regulators issued the facility license before the facility's opening and the Tribal Chairman provided notice to the NIGC of the license and commencement of operation.

114. The Band repurposed and refurbished a set of prefabricated buildings for the Preview Casino, improved and outfitted the buildings, made improvements to the curtilage, the driveway, and the parking area, and entered into a lease agreement for Class II gaming machines.

115. The Band hired nine employees, all of whom are members of the Band, to staff the Class II facility and provided them with substantial training at a casino in Mesquite, Nevada. The Band also intends to expand facility staffing and, consistent with its agreement with the City of Vallejo, plans for at least 15% of its workforce to be hired from the local community. The Band also established a Tribal Gaming Commission, hired commissioners and commission staff, and developed the regulatory infrastructure necessary to oversee gaming operations.

116. On July 24, 2026, the Band commenced operations of the Preview Casino. The Band intended to expand the facility's number of Class II gaming devices in August. Consistent with its agreement with the City of Vallejo, the facility initially operated seven days per week from 10:00 a.m. to 6:00 p.m., with planned expansion to daily operations from 10:00 a.m. to 10:00 p.m. The facility's small size during its time in operation, and even with the planned expansion, means that the facility has negligible impacts on other tribal gaming in the region.

117. Although modest in size, the Preview Casino represented the Band's first opportunity in decades to generate revenue from its restored trust land. It also provided employment to Tribal members and members of the surrounding community, as well as essential training and operational experience for the facility's employees, management, Tribal Gaming Commission, and Tribal government in advance of the Band's planned Class III facility.

118. The Band invested well in excess of $10 million in developing the Preview Casino to begin to exercise the rights granted in the January 2025 Decision.

119. The Decision has immediate and substantial adverse consequences for the Band. Because the Department now deems the Vallejo Site ineligible for tribal gaming under IGRA, the Decision compelled the Band to suspend operation of its gaming facility. The Band turned off the gaming devices and closed the facility on July 31, 2026, the date the Band received the Decision.

120. If the facility remains closed while the Band's challenge to the Decision proceeds, the facility's employees, Tribal Gaming Commissioners and Gaming Commission staff will be laid off or furloughed without pay.

121. Unless the Decision is enjoined and set aside, the Band's investments in the facility, including improvements to the building and surrounding property, gaming equipment, employee recruitment and training, regulatory infrastructure, and governmental planning, will be lost or substantially impaired.

122. Continued closure also delays the Band's planned Class III gaming facility, disrupts Tribal-State compact negotiations and other governmental planning, impairs the Band's ability to retain and expand its trained workforce, deprives the Band of revenues needed to support Tribal governmental programs and services, and results in the loss of community goodwill, operational momentum, and valuable regulatory and operational experience that cannot readily be recreated. The City of Vallejo likewise will lose the ongoing payments the Band agreed to make for public safety and other municipal services during operation of the facility.

123. Every day the facility remains closed is a day that the Scotts Valley Band remains a restored tribe with trust land but without the ability to realize the very economic self-sufficiency that Congress intended the restored lands exception to promote.

124. The Decision reversed the Department's January 2025 Decision, a final determination, not because the governing law changed or because the Department discovered materially different historical facts, but because it applied a materially different analytical framework to the significant historical connection requirement – one that is contrary to this Court's decision in *Scotts Valley I* and contrary to IGRA. This action therefore seeks judicial review of

that final agency action under the Administrative Procedure Act and a determination that the Decision is arbitrary, capricious, or otherwise not in accord with the law.

## CLAIMS FOR RELIEF

### COUNT I

### Violation of the Administrative Procedure Act

### (Failure to Comply with the Remand Order, IGRA, and Part 292)

### 5 U.S.C. § 706(2)(A)

125. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

126. In *Scotts Valley I*, this Court vacated the Department's 2019 Decision because the Department had applied the significant historical connection requirement inconsistently with the Indian canon, the historical context, and the remedial purposes of IGRA's restored lands exception.

127. The Court found that the Department had acknowledged historical evidence supporting the Band's connection to the vicinity of the Vallejo Site but then "chose to devalue" that evidence. *Scotts Valley I*, 633 F. Supp. 3d at 167–68.

128. The Court further held that the Department had failed to evaluate the historical record in light of the Band's landless status, the federal government's responsibility for the disruption of the Band's land relationships, and the remedial purposes of IGRA's restored lands exception.

129. Where an agency acts pursuant to a judicial remand, its discretion is constrained by the law of the case established by the reviewing court and the mandate of the court's remand order. "Under the law of the case doctrine, on remand, an agency must abide by a district court's remand order." *Miami Tribe of Okla. v. United States*, 656 F.3d 1129, 1138 (10th Cir. 2011). Similarly,

the "rule of mandate renders a lower court or decisionmaker, including an administrative agency, 'without power to do anything … contrary to the letter or spirit of' a higher court's 'mandate construed in the light of the opinion of the court deciding the case.'" *Am. Waterways Ops. v. Regan*, 590 F. Supp. 3d 126, 137 (D.D.C. 2022) (quoting *City of Cleveland v. Fed. Power Comm'n,* 561 F.2d 344, 346 (D.C. Cir. 1977)). In short, administrative agencies "may not deviate from a supervising court's remand order." *Alaska v. Nat'l Marine Fisheries Serv.*, 171 F.4th 1145, 1155 n.2 (9th Cir. 2026) (quoting *Cal. Pub. Util. Comm'n v. FERC*, 29 F.4th 454, 462 (9th Cir. 2022)). "Failure to apply the court's directive about what the law is and which factors the agency must consider would be 'legal error.'" *Id.* (quoting *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989)).

130. On remand, the Department issued the January 2025 Decision applying the framework prescribed by *Scotts Valley I:* the Department considered the historical evidence cumulatively, adopted broad understandings of "occupancy" and "vicinity," drew reasonable inferences from the record, and concluded that the Vallejo Site qualified as restored lands.

131. The Challenged Decision nominally acknowledges *Scotts Valley I* and recounts the January 2025 Decision, but in substance returns to the analytical approach of the 2019 Decision that this Court found arbitrary and capricious in *Scotts Valley I*.

132. Among other things, the Challenged Decision: (a) emphasizes the absence of direct evidence of historic use or occupancy of the Vallejo Site itself; (b) discounts the Band's documented occupancy, labor, residence, travel, trade, subsistence, and kinship connections throughout the North Bay; (c) refuses to draw reasonable inferences from the Band's admitted participation in the regional rancho labor economy; (d) discounts cumulative and circumstantial evidence because individual categories of evidence are not independently parcel-specific; (e) minimizes the significance of the historical forces that displaced Native communities and

fragmented the surviving documentary record; (f) resolves uncertainty against the Band despite this Court's instruction that the Indian canon requires reasonable doubt to be resolved in the Band's favor; (g) concludes for the first time that the Vallejo Site lies outside the treaty-ceded territory without confronting the Department's prior treatment of Royce Area 296, applying the Indian treaty canon, or explaining why the contemporaneous understanding of the federal negotiators and the Band's ancestors no longer carried weight; and (h) fails to explain why, under the framework required by *Scotts Valley I*, the treaty's continued-work assurance and express Vallejo provisions location did not corroborate the Band's labor, travel, subsistence, and occupancy connections to Vallejo and the surrounding ceded territory.

133. Based on all of the foregoing elements, among others, the Decision fails to comply with the *Scotts Valley I* remand order. Without any justification, it unlawfully abandons the analytical framework adopted in the January 2025 Decision and required by *Scotts Valley I*.

134. The Decision expressly finds that Chief Augustine's residence in Napa constituted "occupancy" and that such occupancy was attributable to the Band as a whole. Decision at 32–33. Yet it finds that that acknowledged occupancy does not support the Band's significant historical connection to land in the vicinity of the Vallejo Site, based on selectively crediting assertions by the Band's opponents while discounting evidence relied upon by the Band. Decision at 35-38. This includes relying on the asserted presence of a Patwin population in the North Bay to minimize the significance of the conceded presence of the Band in the same region. The Decision also rejects reliable primary source evidence showing that references to "Clear Lake Indians" were references to the Band, based merely on the fact that multiple Pomo tribes reside at Clear Lake today. And it fails to credit inferential or circumstantial evidence in favor of the Band—such as the aborted

attack against Indians at Rancho Suscol in retaliation for recent violence by Clear Lake Indians. This mode of analysis violates *Scotts Valley I*.

135. The Decision finds the Vallejo Site is not located in territory ceded by the Band's ancestors, rejecting the Royce map, which shows the Vallejo Site within such ceded territory. The Department's refusal to rely on Royce Area 296 fails to apply the Indian canon of construction in construing the 1851 treaty, fails to consider the federal government's role in drafting the treaty and the general state of the relevant evidentiary record, and fails to consider other elements of the historical record, all as required by *Scotts Valley I*.

136. The Decision finds that the Band's occupancy of ranchos in the North Bay as a labor force, and the presence of Indians as laborers at Rancho Suscol (the location of the Vallejo Site), did not support an inference of the Band's use or occupancy of the Vallejo Site, because Rancho Suscol had a "unique status" making it "different from other ranchos in the region." Decision at 37-38. This finding is based on an unjustified preference for opponents' evidence and arguments over the evidence submitted by the Band and its experts, a failure to fully consider the relevant evidence in the Band's expert reports, and a consistent resolution of ambiguities against the Band, in violation of *Scotts Valley I*.

137. The Decision also acknowledges that the Band's ancestors "worked, resided, and died on North Bay ranches and farms," but rejects a reasonable inference of use or occupancy in the vicinity of the Vallejo Site because direct evidence concerning the precise parcel is absent. Decision at 39. In making this determination, the Decision fails to give meaningful attention to the considerations required by *Scotts Valley I* and renders the term "in the vicinity" in Part 292 a nullity.

138. The Department further rejected the cumulative force of the evidence relied upon in the January 2025 Decision—including evidence concerning Chief Augustine, the Band's regional labor patterns, travel and trade networks, intermarriage, Rancho Suscol, and Royce Area 296—by refusing to draw reasonable inferences in favor of the Band, or resolve doubts in the Band's favor, as required by *Scotts Valley I*.

139. The Department evaluated separate categories of historical evidence in isolation, rejected each because it did not independently prove parcel-specific use, and failed to consider whether the evidence collectively demonstrated occupancy or subsistence use "in the vicinity of the land."

140. The Department improperly relied upon the possible historical presence or interests of other tribal communities to reject conclusions in favor of the Band. Under the analytical framework required by *Scotts Valley I*, the presence or interests of other tribal communities do not negate, but may coexist with, the Band's historical connection to the Vallejo Site. The Decision's elevation of competing tribes' interests is contrary to *Scotts Valley I*.

141. The Decision is therefore arbitrary and capricious because it fails to comply with the binding judicial remand that governs the Department's implementation of IGRA and Part 292.

142. The Decision must be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A).

**COUNT II**

**Violation of Administrative Procedure Act**

**(Reversal of Decision Without Consideration of Reliance on Prior Decision)**

**5 U.S.C. § 706(2)(A)**

143. Plaintiff alleges and incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

144. An agency changing an existing position that engendered serious reliance interests must consider those interests. *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020); *Scotts Valley II*, 808 F. Supp. 3d at 21.

145. The January 2025 Decision created substantial governmental, economic, regulatory, contractual, and property-based reliance interests. Among other things, the Band: (a) obtained acceptance of the Vallejo Site into trust for the primary purpose of conducting gaming; (b) obtained NIGC approval of its gaming ordinance; (c) established a Tribal Gaming Commission and regulatory infrastructure; (d) entered into agreements with the City of Vallejo; (e) developed and licensed a Class II gaming facility; (f) hired and trained Tribal employees and gaming regulators; (g) entered into leases and other contractual obligations; (h) invested more than $10 million in the facility and related infrastructure; and (i) commenced gaming operations in reliance on the January 2025 Decision.

146. The Challenged Decision did not adequately identify, assess, or account for those serious reliance interests before reversing the final January 2025 Decision.

147. Nor did the Department adequately consider less disruptive alternatives, including maintaining the January 2025 Decision while defending it in the three pending actions before this court or otherwise addressing the opponents' submissions without immediately extinguishing the gaming eligibility upon which the Band had substantially relied.

148. The Decision is therefore arbitrary and capricious because it disregards the Band's serious reliance interests.

149. The Decision must be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A).

## COUNT III

## Violation of the Administrative Procedure Act

## (Arbitrary and Capricious Rationale for Reconsideration of the January 2025 Decision)

## 5 U.S.C. § 706(2)(A)

150. Plaintiff alleges and incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

151. The Challenged Decision is the final agency action resulting from the Department's reconsideration of the January 2025 restored lands determination. The legality of the Decision turns on this Court's review of the procedural and explanatory defects underlying the reconsideration process that produced it.

152. The Department initially asserted that reconsideration was warranted because the January 2025 Decision had not considered materials submitted after this Court's 2022 remand in *Scotts Valley I* and that failing to consider those submissions "could be deemed legal error."

153. The stated concern therefore involved materials allegedly submitted after the judicial remand but before the Department issued the January 2025 Decision—materials that the Department claimed should have been considered in completing the remand.

154. The Department did not identify any error in the legal framework applied in the January 2025 Decision, any abuse of discretion in resolving the remand on the existing administrative record, or any material historical evidence that the January 2025 Decision was legally required to consider.

155. The Department subsequently changed the scope and rationale of reconsideration. In its January 21, 2026 letter, the Department stated that materials submitted between September 30, 2022, and January 10, 2025, would not be treated as part of the reconsideration record unless

resubmitted in June 2025. It instructed the Band that it "need only review and respond to the June 2025 submissions."

156. The Department did not explain why the pre-January 10, 2025, submissions that allegedly justified reconsideration of the final January 2025 Decision were excluded from consideration unless later resubmitted.

157. The Department's failure to disclose or identify the submissions that allegedly necessitated reconsideration deprived the Band of any meaningful opportunity to test the factual predicate for the agency's decision to reopen a final determination. Although the Department later identified the June 2025 submissions it considered in the Challenged Decision, it has never identified the pre-January 10, 2025 submissions that supposedly triggered reconsideration. The Department's stated justification for its reconsideration process cannot be examined or verified because the Department has never disclosed the records on which that justification purportedly rests.

158. Nor has the Department explained how the June 2025 submissions established that the January 2025 Decision involved any legal error.

159. Portions of the June 2025 submissions consisted of evidence, reports, declarations, analyses, and advocacy that did not exist when the Department issued the January 2025 Decision. Thus, such materials could not have been evidence that the Department unlawfully failed to consider in January 2025.

160. The opposing tribes also prepared their June 2025 submissions with the benefit of the completed January 2025 Decision. The reconsideration proceedings therefore afforded them a new opportunity to tailor their submissions to the Department's favorable factual findings and

legal analysis, refine previously unsuccessful arguments, develop new expert opinions and declarations, and directly seek reversal of a completed remand determination.

161. The Department did not explain how permitting that renewed, post-decision advocacy remedied the procedural concern it initially identified or why such a process justified reopening a final 2025 Decision issued in accord with this Court's remand in *Scotts Valley I*.

162. The Department likewise failed to explain how its reconsideration process was consistent with the finality ordinarily afforded final agency action, particularly after the Department in its 2025 Decision relied on the restored lands determination to accept the Vallejo Site into trust and recognize its eligibility for gaming.

163. The Department's unexplained shift from allegedly omitted pre-decision materials to new post-decision evidence and advocacy severed the logical connection between the stated reason for reconsideration and the process the Department ultimately conducted.

164. The Department also did not disclose when it announced reconsideration in March 2025 that it was considering, as a dispositive ground for reversal, a new conclusion that the Vallejo Site lies outside the territory ceded under the Band's 1851 treaty. Nor did it disclose that it might reject Royce Area 296 based on the Band's alleged lack of exclusive authority to cede every portion of the depicted territory, notwithstanding the treaty's express identification of Vallejo as the location for providing provisions to the Band and the federal negotiators' contemporaneous understanding.

165. The Department therefore failed to articulate a coherent and reasoned explanation for reopening the January 2025 Decision, defining the reconsideration record, changing the stated scope of reconsideration, and relying on post-decision materials to reverse a completed final determination.

166. By relying upon grounds, evidentiary standards, and/or interpretive theories materially different from those disclosed during the reconsideration proceedings, the Department also failed to provide the Band with a procedurally adequate opportunity to address the actual grounds upon which the Challenged Decision rested.

167. The Decision is the product of a reconsideration process that was arbitrary, capricious, inadequately explained, and conducted without observance of procedures required by law.

168. The Challenged Decision must therefore be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A) and (D).

**COUNT IV**

**Violation of Procedural Due Process (U.S. Const. amend. V)**

**Violation of the Administrative Procedure Act (5 U.S.C. § 706(2)(A), (B), and (D))**

169. Plaintiff alleges and incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

170. The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving a person of property without due process of law.

171. In *Scotts Valley II*, this Court held that the Department's 2025 Decision created a constitutionally protected property interest in the gaming eligibility of the Vallejo Site. *Scotts Valley Band of Pomo Indians v. Burgum*, 808 F. Supp. 3d 1, 25 (D.D.C. 2025).

172. The Challenged Decision deprived the Band of that protected property interest by reversing the gaming eligibility recognized in the January 2025 Decision and immediately requiring the Band to cease gaming operations.

173. Before depriving the Band of that protected interest, the Department was required to provide constitutionally adequate notice of the factual and legal grounds under consideration and a meaningful opportunity to respond to the grounds ultimately relied upon.

174. The Department failed to provide adequate notice of the grounds on which it decided in March 2025 to reconsider the January 2025 Decision. The Department initially asserted it was "concerned that the Department did not consider additional evidence submitted after the 2022 Remand," and later stated that "not taking those submissions into consideration in this particular case could be deemed legal error." However, the Department never provided a reasoned explanation of how or why its discretionary choice to close the record after remand may constitute legal error. Nor did the Department provide the Band a meaningful opportunity to respond to the asserted basis for reconsideration. To date, the Department has not disclosed or provided copies of the materials that had been submitted between this Court's 2022 remand order and the January 2025 Decision which assertedly prompted the Department to commence reconsideration, despite the Band's request for these materials.

175. These failures, present from the outset of the reconsideration process and continuing thereafter, were arbitrary and capricious in violation of the APA and the Band's Constitutional due process rights.

176. The Department subsequently abandoned the rationale it had advanced for reopening the January 2025 Decision. In its January 21, 2026 letter, the Department informed the Band that it would not consider the submissions received between September 30, 2022 and January 10, 2025—the very submissions whose alleged omission had purportedly justified reconsideration. Instead, the Department limited the proceeding to the June 2025 submissions and instructed the Band that it "need only review and respond to the June 2025 submissions."

177. This fundamentally altered the proceeding, by permitting consideration of materials created after the January 2025 Decision that could have not been omitted from that Decision. The Department considered numerous post-decision submissions—including new advocacy, expert analyses, litigation filings, governmental comments, and legal arguments submitted between March and June 2025 by Lytton Rancheria, the Federated Indians of Graton Rancheria, the United Auburn Indian Community, Yocha Dehe Wintun Nation, the State of California, Solano County, the City of Vallejo, and other interested parties.

178. By relying on newly created evidence and advocacy targeted specifically at overturning the completed January 2025 Decision, the Department transformed what it had represented would be a limited reconsideration to correct an alleged procedural omission into an entirely new adjudication.

179. The Department never acknowledged or explained this material change in course. Nor did it explain how excluding the submissions it had previously identified as the source of the alleged legal error, while relying on an entirely new body of evidence (created months after the January 2025 Decision) remedied the asserted procedural defect.

180. The Department thus abandoned the rationale on which it reopened the January 2025 Decision and substituted a materially different reconsideration process without notice, explanation, or a meaningful opportunity for the Band to respond to the new rationale.

181. The failure to articulate a rational connection between the reason the Department gave for reopening the January 2025 Decision and the reconsideration process it ultimately conducted was arbitrary and capricious in violation of the APA.

182. The failure to provide the Band with notice, explanation, or a meaningful opportunity to respond to the new rationale also, once again, violated the Band's due process rights.

183. The 2026 Decision must therefore be declared unlawful and set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that the Department's July 30, 2026 Decision is arbitrary, capricious, contrary to law, in excess of statutory authority, contrary to constitutional right, and otherwise unlawful under the Administrative Procedure Act;

B. Declare that the Department is equitably estopped from altering its previous holding that Royce Area 296 accurately depicts the territory ceded to the United States by the Band's ancestors.

C. Hold unlawful, vacate, and set aside the July 30, 2026, Decision and any agency action taken in reliance upon or to implement that Decision;

D. Pursuant to Federal Rule of Civil Procedure 65, preliminarily and permanently enjoin the Department, its officers, employees, agents, and successors from implementing, enforcing, or otherwise giving legal effect to the July 30, 2026 Decision;

E. Declare that, upon vacatur of the July 30, 2026 Decision, the Department's January 10, 2025 restored-lands determination remains in full force and effect, including its determination that the Vallejo Site is eligible for gaming under IGRA's restored-lands exception;

F. Award Plaintiff its costs and, to the extent authorized by law, its reasonable attorneys' fees; and

G. Grant such other and further relief as the Court deems just and proper.

Dated: August 7, 2026

Respectfully submitted,

By: *s/ Patrick R. Bergin*

Patrick R. Bergin (D.C. Bar No. 493585)
Tim Hennessy (D.C. Bar No. CA00040)
PEEBLES BERGIN SCHULTE & ROBINSON LLP
2020 L Street, Suite 250
Sacramento, CA 95811
(916) 441-2700
pbergin@ndnlaw.com
thennessy@ndnlaw.com

Conly J. Schulte (D.C. Bar No. NE20158)
PEEBLES BERGIN SCHULTE & ROBINSON LLP
945 Front St.
Louisville, CO 80027
(303) 284-8228
cschulte@ndnlaw.com

Arlinda F. Locklear (D.C. Bar No. 962845)
4113 Jenifer Street, NW
Washington, D.C. 20015
(202) 237-0933
alocklearesq@verizon.net

Attorneys for Scotts Valley Band of Pomo Indians