**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SCOTTS VALLEY BAND OF POMO INDIANS,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF THE INTERIOR**, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-02814 (TNM) |

**MEMORANDUM ORDER**

This case is about an Indian tribe's quest to build a casino. A decade ago, the Scotts Valley Band of Pomo Indians asked the Department of the Interior to allow it to conduct gaming on a parcel in Vallejo, California. After several rounds of litigation, Interior recently issued a final determination that the Band's Vallejo parcel is ineligible for gaming. Foiled in its casino plans, Scotts Valley now moves for a preliminary injunction that would vacate Interior's latest opinion and restore the agency's previous decision in the Band's favor.

The Band's bid for preliminary relief fails on all four factors. Scotts Valley has not shown likelihood of success on any of its claims. It has not established that Interior's decision on gaming eligibility defied the remand order from another judge in this district. Nor is the Band likely to prevail on its claims that Interior's reconsideration process was arbitrary and capricious, that the agency disregarded its reliance interests, or that Interior violated its due-process rights. Scotts Valley also does not clear the high bar for irreparable harm, whether for its economic losses or sovereign harm. Finally, the equities and public interest weigh against preliminary relief.

## I.

The facts are familiar to followers of this case by now. *See Scotts Valley Band of Pomo Indians v. U.S. Dep't of the Interior*, 633 F. Supp. 3d 132 (D.D.C. 2022) ("*Scotts Valley I*"); *Scotts Valley Band of Pomo Indians v. Burgum*, 2025 WL 1639901 (D.D.C. June 10, 2025) ("*Scotts Valley II*"); *Scotts Valley Band of Pomo Indians v. Burgum*, 808 F. Supp. 3d 1 (D.D.C. 2025) ("*Scotts Valley III*"). The Court retells and updates them here.

Scotts Valley is a federally recognized Indian tribe from the Clear Lake region in Northern California that became landless in the mid-20th century after Congress ended its reservation. *Scotts Valley III*, 808 F. Supp. 3d at 10. For ten years, the Band has sought to build a casino in Vallejo, roughly 80 miles from Clear Lake. *Id.*; *see also Scotts Valley I*, 633 F. Supp. 3d at 158.

In 2016, Scotts Valley asked Interior to take a Vallejo parcel into trust on its behalf and to declare it eligible for gaming under the Indian Gaming Regulatory Act ("IGRA"). *Scotts Valley III*, 808 F. Supp. 3d at 10. The Band invoked IGRA's "restored lands" provision, *id.*, which allows gaming on "lands . . . taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition," 25 U.S.C. § 2719(b)(1)(B)(iii). Under Interior regulations, a tribe seeking gaming eligibility via that provision "must demonstrate a significant historical connection to the land." 25 C.F.R. § 292.12(b). Interior denied Scotts Valley's application, finding that the Band had not established "a significant historical connection" to the parcel. *Scotts Valley I*, 633 F. Supp. 3d at 139 (cleaned up).

The Band sued, and another judge in this district vacated and remanded Interior's decision. *Id.* at 165. The court rejected all but one of Scotts Valley's claims. *See id.* at 141–71. It held that Interior "did not act outside of its statutory authority under the Indian Gaming

Regulatory Act or the Indian Reorganization Act when it promulgated . . . a regulation requiring tribes to demonstrate a 'significant historical connection' for purposes of the restored lands exception." *Id.* at 171. But the court "conclude[d] that the agency's application of its regulation to the Band under the particular factual circumstances of this case was inconsistent with the canon of Indian construction and clear policy behind the IGRA and the restored lands exception." *Id.* In particular, the court faulted Interior for disregarding "the government's role in weakening the historical connection between the Band and its land" and "the fundamental remedial nature of the restored lands exception." *Id.* at 165–68. Given those shortcomings, the court reasoned, Interior's gaming eligibility decision could not "withstand arbitrary and capricious review." *Id.* at 171.

On remand, Interior reversed itself in Scotts Valley's favor. In the Biden Administration's final month, the agency issued an Indian Lands Opinion ("ILO") "conclud[ing] that the Parcel qualifies as restored lands." 2025 ILO, ECF No. 2-2, at 2. That finding flowed from Interior's "ha[ving] given additional consideration to (1) the historical circumstances underlying the Band's landless status; and (2) the policy underlying IGRA and the restored lands exception." *Id.* At the same time, Interior's 2025 ILO did not "consider[] any additional evidentiary materials from outside parties," including "those opposed to the Band's request." *Id.* at 3–4; *see also* Mot. Hr'g Tr., ECF No. 48, at 24:2–3 ("[T]he Department made th[e] 2025 decision based on the record that it had in 2019 . . . ."). Based on its revised determination, Interior took the Vallejo parcel into trust on Scotts Valley's behalf and declared it eligible for gaming. *Scotts Valley III*, 808 F. Supp. 3d at 10.

This state did not last long. Frustrated with Interior's refusal to consider their post-remand submissions challenging the Band's historical ties to the Vallejo parcel, four neighboring

tribes sued the agency after the Trump Administration took over. *See id.* at 10–12. Those lawsuits remain pending. *See Yocha Dehe Wintun Nation et al. v. Dep't of Interior et al.*, No. 25-cv-867 (D.D.C. filed Mar. 24, 2025); *United Auburn Indian Cmty. v. Dep't of Interior et al.*, No. 25-cv-873 (D.D.C. filed Mar. 24, 2025); *Lytton Rancheria of Cal. v. Dep't of Interior et al.*, No. 25-cv-1088 (D.D.C. filed Apr. 10, 2025).

Days after those lawsuits hit the docket, Interior reversed course again. In a March 2025 letter to the Band, the agency announced that it was "temporarily rescinding the Gaming Eligibility Determination for reconsideration," though the Vallejo parcel "remain[ed] in trust." March 2025 Letter, ECF No. 10-8, at 1 (footnote omitted). Interior explained that it was "concerned that [it] [ha]d not consider[ed] additional evidence submitted after the 2022 Remand." *Id.* "To aid in [its] reconsideration," Interior "invite[d] the [Band] and other interested parties to submit evidence and/or legal analysis regarding whether the Vallejo Site qualifies as restored lands." *Id.* The agency also instructed that "any documents submitted to the Department after the 2022 Remand should be resubmitted." *Id.* Finally, Interior advised that "[d]uring the pendency of this reconsideration, neither the [Band] nor any other entity or person should rely on the Gaming Eligibility Determination." *Id.*

Shortly after receiving Interior's letter, Scotts Valley sued once more, "assert[ing] that Interior's rescission and reconsideration of its gaming eligibility violated § 706 of the Administrative Procedure Act and infringed its Fifth Amendment right to due process." *Scotts Valley III*, 808 F. Supp. 3d at 12 (footnote omitted). The Band moved for a preliminary injunction to vacate Interior's rescission and "to immediately stop" the reconsideration. *Scotts Valley II*, 2025 WL 1639901, at *1.

This Court denied that motion. *Id.* at *9. As the Court held, the Band had not carried its "heavy burden to show that any harms it could experience during this litigation w[ould] be irreparable." *Id.* at *1. Neither the economic nor sovereign injury met the mark. *Id.* On the economic side, the Court reasoned that "[e]ven if all $2 million in anticipated contract payments were due before the likely end of this litigation—and the tribe ha[d] made no such showing—the Band ha[d] not shown that this expenditure would 'threaten[] the very existence of the movant's business' or similarly compromise tribal services and programs." *Id.* at *4 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). As to sovereign harm, the Court concluded that the Band had forfeited its argument. *Id.* at *1. And even if properly argued, "any sovereignty change" in the Band's ability to conduct and regulate gaming "ha[d] not produced the type of actual, tangible harm that the D.C. Circuit requires." *Id.* at *6 (cleaned up). Because of the Band's failure to establish irreparable harm, the Court denied its bid for preliminary relief. *Id.* at *1.

Then came summary judgment, where Scotts Valley secured a narrow win. The Court rejected the Band's challenge to the ongoing reconsideration because that process was "non-final and thus not subject to APA review." *Scotts Valley III*, 808 F. Supp. 3d at 10. The rescission, by contrast, "amounted to final agency action." *Id.* at 16. The Court ruled against Scotts Valley's three APA claims targeting the rescission: that it exceeded Interior's reconsideration authority, that it resulted from undue political influence, and that it disregarded the Band's reliance interests. *Id.* at 16–23.

But the Court held in Scotts Valley's favor on one claim: due process. *Id.* at 23. As the Court concluded, "the Band's gaming eligibility was a protected property interest," and "Interior provided too little process to rescind it." *Id.* Because Interior's rescission "infringed the Band's

due-process right," the Court vacated it. *Id.* at 28. As the Court emphasized, though, that "remedy d[id] not bar Interior from continuing its reconsideration, nor d[id] it stop the Department from revoking the Band's gaming eligibility at the end of that process." *Id.* "For that reason," the Court cautioned Scotts Valley that it "would be ill-served by placing undue reliance on [the] decision." *Id.*

After this summary-judgment ruling, Interior adapted its reconsideration process. In December 2025, Interior shared with the Band all the "evidence and legal analysis" that other tribes and stakeholders had submitted to the agency by June of that year. 2026 ILO, ECF No. 2-1, at 3 (cleaned up). After twice "discuss[ing] a time frame for reconsideration with the Band," Interior "gave the Band until May 1, 2026, to review and respond to the June 2025 Submissions." *Id.* (footnotes omitted). Interior officials also met with the Band in person in mid-April, where the Band delivered its response. *Id.* at 3–4. Upon receiving Scotts Valley's response, Interior "accepted no further submissions." *Id.* at 4.

While Interior was reconsidering, the Band forged ahead with its gaming plans. After this Court vacated the rescission in *Scotts Valley III*, "the Band proceeded with development of the Vallejo Site in reliance on the 2025 [ILO] and the rights it conferred." Davis Decl., ECF No. 10-2, ¶ 20. Scotts Valley "undertook substantial expenditures and financial commitments"—to the apparent tune of $10 million—"to develop gaming operations at the Vallejo Site, including the development of a temporary Class II gaming facility known as the 'Preview Casino.'" *Id.* ¶¶ 23, 56. To set up the "Preview Casino," the Band "convert[ed] two modular buildings." *Id.* ¶ 26. The casino opened "on a limited basis" on July 24, 2026. *Id.* ¶ 37. During its operation, the Preview Casino offered 17 class II gaming devices (bingo and the like) maintained by nine Band members. *See id.* ¶ 33; Mot. Hr'g Tr. at 11:3–8.

A week later, Interior issued its reconsidered ILO. As the agency concluded, "the Vallejo Parcel does not qualify as restored lands within the meaning of applicable law, and the Band may not conduct gaming on the Parcel pursuant to IGRA's restored lands exception." 2026 ILO at 39. In its 39-page analysis, Interior examined the original 2019 ILO, the 2025 ILO, the other tribes' and stakeholders' June 2025 submissions, and the Band's response. *Id.* at 12–31. The agency recounted the "additional historical context" of the Band's displacement and dispossession throughout the 19th century. *Id.* at 14–16. Interior also considered "the fundamental remedial nature of the restored lands exception and the Indian canon of construction," including by "adopt[ing] broad understandings of the terms 'occupancy' and 'vicinity' within Part 292's definition of 'significant historical connection.'" *Id.* at 18 (cleaned up). Ultimately, though, the newly submitted evidence led Interior to "revisit several factual questions that [had] inform[ed]" the 2025 ILO. *See id.* at 31–39. Viewed as a whole, the record now counseled that "the Band ha[d] not demonstrated the requisite significant historical connection." *Id.* at 39.

One week after Interior's reconsidered ILO, Scotts Valley came back to this Court. Like its predecessor, the Band's newest lawsuit brings three APA claims and one due-process claim. Compl., ECF No. 2, ¶¶ 125–83. On the heels of its Complaint, the Band also filed a motion for a preliminary injunction, which asks the Court to "(1) enjoin[] the Department from implementing and otherwise giving legal effect to the July 30, 2026, [ILO] during the pendency of the Band's action for judicial review of the Decision; and (2) [to] reinstat[e] and preserv[e] the legal force

and effect of the January 2025 [ILO] during the pendency of this action." Mot. Prelim. Inj., ECF No. 10, at 1. That motion is fully briefed,[1] and the Court held a motion hearing.

## II.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (cleaned up). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[T]he degree of proof required for irreparable harm is high," and "a failure to surmount it provides grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019) (cleaned up). Meanwhile, the equities and public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.

Like every movant, Scotts Valley faces an uphill battle to win preliminary relief. The Band falters on every front. The likelihood of success on the merits, irreparable harm, and the merged equities and public interest all counsel against a preliminary injunction. The Court addresses each factor in turn.

---

[1] The Court acknowledges the helpful amicus briefs in this case. *See* Governor Newsom Amicus Br., ECF No. 38; Lytton Rancheria Amicus Br., ECF No. 39; United Auburn Amicus Br., ECF No. 40; Patwin Tribes Amicus Br., ECF No. 41; Cal. Gaming Ass'n Amicus Br., ECF No. 42.

**A.**

Scotts Valley advances four claims. First, the Band asserts that the 2026 ILO violated the remand order in *Scotts Valley I*. Compl. ¶¶ 125–42; Mot. Prelim. Inj. at 17–31. Second, it contends that Interior did not adequately justify its decision to reconsider the 2025 ILO. Compl. ¶¶ 150–68; Mot. Prelim. Inj. at 31–37. Third, the Band argues that the agency again ignored its reliance interests. Compl. ¶¶ 143–49; Mot. Prelim. Inj. at 39–45. And finally, Scotts Valley maintains once more that Interior infringed its due-process rights. Compl. ¶¶ 169–83; Mot. Prelim. Inj. at 37–39. The Band is unlikely to succeed on any of these theories.

**1.**

Start with *Scotts Valley I*'s remand order. According to the Band, the 2026 ILO "unlawfully abandon[ed] the analytical framework adopted in the January 2025 [ILO] and required by *Scotts Valley I*." Compl. ¶ 133. A proper application of that "analytical framework," the Band contends, would have compelled a favorable finding on the Vallejo parcel's gaming eligibility. *See id.* ¶¶ 134–39; Mot. Prelim. Inj. at 20–22. The Band claims the 2026 ILO's departure from *Scotts Valley I* makes it arbitrary and capricious. Compl. ¶ 141.

Recall that in *Scotts Valley I*, Judge Jackson held that the 2019 ILO "was inconsistent with the canon of Indian construction and clear policy behind the IGRA and the restored lands exception." 633 F. Supp. 3d at 171. In the court's view, "Interior's parsimonious interpretation" of the "significant historical connection" requirement defied the Indian canon's instruction to "constru[e] the law liberally and interpret[] any ambiguous provision to the tribe's benefit." *See id.* at 168. In particular, the court took issue with Interior's failure to consider "the government's role in weakening the historical connection between the Band and its land" and "the fundamental remedial nature of the restored lands exception." *Id.* at 165–68. Considering those failures, the

court vacated the 2019 ILO as arbitrary and capricious and remanded it to Interior "for further proceedings consistent with th[e] opinion." *Id.* at 171.

The Band is unlikely to succeed on its fact-intensive claim that the 2026 ILO infringed *Scotts Valley I*.

**a.**

"Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995). While the remanding court may set forth the governing law, it "may not . . . 'dictate to the agency the methods, procedures, and time dimension of the needed inquiry and order the results to be reported to the court without opportunity for further consideration on the basis of the new evidence by the agency.'" *See Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, 836 F. Supp. 3d 137, 154 (D.D.C. 2026) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 544–45 (1978)).

Against that backdrop, consider first where the parties agree: the Indian canon's proper role on remand. Both the 2025 and 2026 ILOs emphasized that "although the Indian canon requires that ambiguous *laws* be interpreted in favor of the Indians, the canon 'has no applicability to the weighing of evidence, for example, regarding occupancy or use of a given plot of land.'" 2026 ILO at 31 (quoting 2025 ILO at 10). At the motion hearing, both Interior and Scotts Valley concurred that the Indian canon does not apply to an agency's factfinding—*i.e.*, that *Scotts Valley I* did not compel Interior to weigh ambiguous facts in the Band's favor. *See* Mot. Hr'g Tr. at 17:15–24, 49:6–11.

Rightly so. Like other substantive canons, the Indian canon is a "rule[] of construction that advance[s] values external to a statute." *See Biden v. Nebraska*, 600 U.S. 477, 508 (2023) (Barrett, J., concurring) (footnote omitted). It instructs "that statutes dealing with the Indians must be construed in their favor." Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 151 (2010). The canon emerged in the 19th century, with courts deploying it when interpreting treaties between Indians and the United States. *Id.*; *see, e.g.*, *Worcester v. Georgia*, 31 U.S. 515, 582 (1832) (M'Lean, J., concurring) ("The language used in treaties with the Indians should never be construed to their prejudice. . . . How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction."). In other words, the canon began "as essentially a rule of contract interpretation." Barrett, *supra*, at 152. Then, in the early 20th century, the canon "jumped without discussion from the interpretation of treaties to the interpretation of statutes." *Id.*; *cf. Arizona v. Navajo Nation*, 599 U.S. 555, 572 (2023) (Thomas, J., concurring) ("To this day, it remains unclear how the 'trust relationship' [between Indians and the federal government] could justify freestanding pro-Indian canons that authorize courts to depart from the ordinary rules of statutory interpretation.").

Whatever the Indian canon's pedigree in the context of treaties and statutes, its role ends there. In *Mashpee Wampanoag Tribe v. Bernhardt*, 466 F. Supp. 3d 199 (D.D.C. 2020), the court rebuffed an effort to extend it to agency factfinding. There, "[t]he Mashpee Tribe invoke[d] the Indian canon of construction in order to suggest that the [agency's] application of" a two-part factual test "should be favorable to the Tribe." *Id.* at 216. But that "argument misunderst[ood] the canon." *Id.* "The Indian canon of construction says that ambiguous statutes should be construed liberally in favor of Indians." *Id.* After statutory ambiguity is "resolved,

however, the canon's role is complete." *Id.* at 217; *see also Ute Indian Tribe of the Uintah & Ouray Indian Rsrv. v. United States*, 185 F.4th 244, 252 (D.C. Cir. 2026) (stating that the Indian canon "ha[s] no application where the relevant law is unambiguous"). Extending the canon to agency factfinding would "place courts, not democratically accountable executive officials, in the policymaking role the Framers (and the drafters of the APA) reserved for the political branches." Cal. Gaming Ass'n Amicus Br., ECF No. 42, at 8. And that expansion would be particularly inappropriate here, where applying the canon in Scotts Valley's favor would harm the interests of several neighboring tribes. *Accord Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*, 75 F. Supp. 3d 387, 396 (D.D.C. 2014) ("[T]he Indian canon of construction does not apply for the benefit of one tribe if its application would adversely affect the interests of another tribe."), *aff'd*, 830 F.3d 552 (D.C. Cir. 2016).

Rather than falling under the Indian canon's purview, agency factfinding is "subject to arbitrary and capricious review under the APA." *Mashpee Wampanoag Tribe*, 466 F. Supp. 3d at 217 (cleaned up). "[W]hen an agency exercises discretion granted by a statute, judicial review is typically conducted under the [APA]'s deferential arbitrary-and-capricious standard." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 179–80 (2025). "Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Id.* at 180.

An agency decision is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.*; *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) (emphasizing that APA "Section 706 *does* mandate that judicial review of agency policymaking and factfinding be deferential").

**b.**

The Band is unlikely to establish that the 2026 ILO fell short of the APA's or *Scotts Valley I*'s demands. Interior's 39-page analysis reviewed the entire record—including the 2019 ILO, the 2025 ILO (which was based on the same evidence as the 2019 one), the June 2025 submissions from third parties, and the Band's response. 2026 ILO at 12–31. Consistent with its 2025 predecessor and in keeping with *Scotts Valley I*, the 2026 ILO laid out the "additional historical context" on the Band's displacement at the hands of Mexican settlers and the U.S. government. *See id.* at 14–16; *see also* 2025 ILO at 15–18; *Scotts Valley I*, 633 F. Supp. 3d at 165–68. On that same note, the 2026 ILO also considered "the fundamental remedial nature of the restored lands exception and the Indian canon of construction," including by adhering to the 2025 ILO's "broad understandings of the terms 'occupancy' and 'vicinity' within Part 292's definition of 'significant historical connection.'" *See* 2026 ILO at 18 (cleaned up); *see also* 2025 ILO at 19–20.

Through that lens, the 2026 ILO drew certain inferences in Scotts Valley's favor. One of them concerned a Band ancestor: "an individual named Augustine, a 'chief of the Hoolanapo Indians' who lived and worked in the North Bay region during the mid-1800s." 2026 ILO at 11 (footnote omitted). The 2026 ILO stood by the 2025 ILO's finding that "Augustine and other Band ancestors worked on ranchos in the North Bay Region." *Id.* at 32. As Interior explained, the history showed "that the livestock operations on the ranchos were labor-intensive, involving

hundreds of Indian laborers, and that the Vallejos and other settlers raided Pomo communities, including at Clear Lake, to work on the ranchos." *Id.* (footnote omitted). The 2026 ILO also "confirm[ed] that Augustine's residency in Napa in the 1870s constituted occupancy, as defined in the 2025 ILO," and it "le[ft] in place the determination that that occupancy is attributable to the Band as a whole, for the reasons stated in the 2025 ILO." *Id.* at 33 (footnote omitted); *see also Scotts Valley I*, 633 F. Supp. 3d at 168 (faulting the 2019 ILO for "declin[ing] to attribute Augustine's connections to the land to the Band as a whole").

Ultimately, though, the updated record made Interior conclude that "the Band ha[d] not demonstrated the requisite significant historical connection." 2026 ILO at 39. The newly submitted evidence led the agency to "revisit several factual questions." *Id.* at 31. Three merit closer examination.

*First*, the 2025 ILO had noted "Augustine's possible baptism at Mission San Francisco Solano in the late 1830s," which it deemed "consistent with a broader, documented practice of the removal of Indian children from their villages and their placement in the missions." 2025 ILO at 17. The 2025 ILO "credit[ed] th[is] experience[] of Augustine to the Band as a whole for the purposes of demonstrating a significant historical connection to the Parcel." *Id.* at 17–18. The 2026 ILO, meanwhile, found this assumption untenable in light of new evidence. 2026 ILO at 31. As Interior now observed, "the names of the parents of the Agustin listed in the relevant baptismal register, as well as the name of his village, are different from those associated with the Band's ancestor Augustine." *Id.* (footnote omitted). In the agency's view, two other tribes "persuasively argue[d] that 'the names of the 1837 Baptismal Cohort, the names of the parents of the 1837 Baptismal Cohort, and the village of origin of the 1837 Baptismal Cohort are all distinctively Southern Pomo,' not Eastern Pomo like the Band's ancestors." *Id.* at 32 (cleaned

up). Based on those and other submissions, Interior reversed its previous assumption that Augustine (and, by extension, the Band) had possibly been baptized near the Vallejo parcel. *Id.*

*Second*, Interior reassessed its finding on the Band's presence at Rancho Suscol, the large Mexican ranch that embraced what now is the Vallejo parcel. *See id.* at 12. On that evidentiary issue, the 2025 ILO had reasoned that "[a]lthough no documentation link[ed] the Band's ancestors specifically to Rancho Suscol . . . , it [wa]s reasonable to assume that the Band's ancestors worked there after Vallejo acquired it in 1843 and used or occupied the Parcel in the process." 2025 ILO at 23 (footnote omitted). By contrast, the 2026 ILO highlighted the third-party submissions contesting Scotts Valley's ties to Rancho Suscol. 2026 ILO at 24–25. The Yocha Dehe Tribe, for example, "explain[ed] that by 1870 the Project Site [on Rancho Suscol] was a small family farm owned and worked by non-Indian labor and that, before that, Rancho Suscol had been set aside as a Rancho Nacional, . . . for *military* use, and therefore distinct from the other ranchos controlled by the Vallejos." *Id.* at 25 (cleaned up). "Contrary to leading to a natural inference of use or occupancy," the 2026 ILO reasoned, "the evidence (or the lack of it) suggests that Rancho Suscol was indeed different from other ranchos in the region, as the opposing parties contend[ed]." *Id.* at 37 (footnote omitted).

*Finally*, Interior reconsidered "whether the Parcel is located in territory ceded by the Band's predecessors." *Id.* at 31. In 1851, "the Band's predecessors-in-interest were tribal signatories to an unratified treaty with the United States," in which they agreed to cede certain California lands. *Id.* at 9. "In exchange, the United States designated a tract of land to be set apart as a reservation on the western shore of Clear Lake . . . ." *Id.* Some decades later, "cartographer Charles Royce compiled maps purporting to depict Indian land cessions in the United States, including the land that would have been ceded under the 1851 Treaty, as well as

tracts set apart for reservations, including the reservation at Clear Lake." *Id.* (footnote omitted). The Court reproduces an excerpt from the map below.




*Id.* at 10. "The area numbered '296' . . . purports to show the ceded territory, while the area numbered '295' . . . shows the Clear Lake reservation." *Id.* at 9. The Vallejo parcel "is located in the southwestern portion of Area 296, south of Napa." *Id.* at 10. According to the 2025 ILO, "Royce's inclusion of Vallejo in Area 296 . . . reinforce[d] the reasonableness of granting a favorable inference to the Band," "notwithstanding the fact that the 1851 Treaty did not specifically describe the land that its tribal signatories used, occupied, or purposed to cede." 2025 ILO at 23 (cleaned up).

The 2026 ILO rethought that conclusion. In the June 2025 submissions, several third parties "challenge[d] the reasonableness of the inference linking the Band with the Parcel based on the Parcel's location within Area 296." 2026 ILO at 25. One of the other tribes' historians,

for example, "explain[ed] that the 1851 Treaty 'failed to describe the ceded lands,' only the reservation to be set aside at Clear Lake." *Id.* (footnote omitted). In his assessment, "Royce's description of the ceded lands in his map amounted to a 'guess.'" *Id.* (footnote omitted). He also "point[ed] out that none of the tribes residing along the north side of San Francisco and San Pablo bays entered into [the 1851] treaty negotiations with the United States." *Id.*

Faced with these new submissions, the 2026 ILO withdrew its inference in favor of the Band's occupancy. *Id.* at 33. As Interior now reasoned, "[e]ven if . . . Area 296 depicts what the federal agents who negotiated the 1851 Treaty understood to be the boundaries of the ceded territory, no one seems to argue that the Band, its predecessors, or the other tribal signatories had the authority to cede the land around Vallejo at the time of the treaty." *Id.* And "nothing in the extensive record before the Department suggest[ed] that they had that authority." *Id.* Because of the Royce map's historical deficiencies, the 2026 ILO concluded that "[f]avorable treatment of Royce's map in this analysis would not only be ahistorical but also unfair to any successors-in-interest of the original inhabitants of those territories, who did not participate in the negotiation of the 1851 Treaty." *Id.* (footnote omitted).

These were some of the key evidentiary issues on which Interior revised its findings in light of new evidence. Zooming out, the 2026 ILO also noted "the shortcomings in the Band's evidence, more generally." *Id.* at 37. Especially "striking," according to Interior, "[wa]s the discrepancy between the evidence of a Band presence elsewhere during the time period in question, in places where the Band might attain a different result, and the lack of evidence indicating a Band presence on Rancho Suscol, much less the Parcel." *Id.* (cleaned up). Ultimately, even considering Scotts Valley's historical displacement and IGRA's remedial

purpose, "the Band ha[d] not demonstrated the requisite significant historical connection." *See id.* at 39.

* * *

As the above recounting shows, "[t]he Vallejo parcel's gaming eligibility is an avowedly complex question." *Scotts Valley III*, 808 F. Supp. 3d at 18. It raises issues of the accuracy of historical documents and assumptions based on tantalizing clues. Some of these issues could arguably go either way. But whether the Band demonstrated a "significant historical connection" to the parcel involves fact-intensive judgments that fall within Interior's realm of expertise. In this setting, "[t]he Court recognizes that it is not its role to scour through the ILO and substitute its judgment for that of the agency." *Scotts Valley I*, 633 F. Supp. 3d at 168. Instead, this is where the APA's "deferential arbitrary-and-capricious standard" applies, and it requires only that the agency decision be "reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 179–80.

Against this backdrop, the Court holds that Scotts Valley is unlikely to succeed on its claim that the 2026 ILO defied *Scotts Valley I* or was otherwise arbitrary and capricious. The Band has not made "a clear showing" that Interior's reconsidered analysis was inconsistent with *Scotts Valley I*'s demands or the 2025 ILO's overall method. *See Mazurek*, 520 U.S. at 972 (cleaned up). Rather, at this preliminary stage, the record suggests that the 2026 ILO reversed Interior's previous finding based on an updated set of facts. That is no APA violation.

**2.**

Scotts Valley also asserts that Interior "had no lawful basis to reopen the 2025 [ILO]." Mot. Prelim. Inj. at 32–34. The Band faults Interior for "fail[ing] to articulate a coherent and

reasoned explanation" for revisiting the 2025 ILO. Compl. ¶ 165. This Court rejected the bulk of that claim in *Scotts Valley III*, and it remains unlikely to succeed now.

In this case's previous iteration, Scotts Valley contended that Interior's decision to rescind the parcel's gaming eligibility "exceeded [its] authority to revisit its prior decision." *Scotts Valley III*, 808 F. Supp. 3d at 16–17 (cleaned up). The Court disagreed, emphasizing the D.C. Circuit's longstanding "rul[ing] that 'administrative agencies . . . possess at least some inherent authority to revisit their prior decisions.'" *Id.* at 17 (quoting *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.)). In the Court's eyes, the rescission fell within Interior's inherent authority to reconsider. *Id.* at 19. For one part, the Court saw "no statutory limit on Interior's reconsideration authority." *Id.* at 17–18. For another, the agency's decision to revisit the 2025 ILO less than eleven weeks after its issuance met the doctrinal guideposts for timeliness. *Id.* at 18–19. That conclusion holds true today, and it foils Scotts Valley's renewed challenge to the "lawful basis [of] reopen[ing] the 2025 [ILO]." *See* Mot. Prelim. Inj. at 32–34.

Nor is the Band likely to succeed on its theory that Interior "failed to articulate a coherent and reasoned explanation" for exercising its inherent authority to reconsider the 2025 ILO. Compl. ¶ 165. In the March 2025 letter that launched the reconsideration process, Interior stated that it "[wa]s concerned that the Department did not consider additional evidence submitted after the 2022 Remand." March 2025 Letter at 1. In announcing its intent to continue reconsideration post-*Scotts Valley III*, the agency reaffirmed its "concern[] that not taking those submissions into consideration in this particular case could be deemed legal error." December 2025 Letter, ECF No. 10-9, at 1. Interior also explained that its misgivings revolved around "whether the Vallejo Site qualifies as restored lands under 25 U.S.C. § 2719(b)(l)(B)(iii) and 25 C.F.R. Part 292."

March 2025 Letter at 1. On that issue, the agency "invite[d] the [Band] and other interested parties to submit evidence and/or legal analysis." *Id.* "To ensure that [it] ha[d] all the relevant materials," Interior also advised that "any documents submitted to the Department after the 2022 Remand should be resubmitted." *Id.*

Interior's unease about legal error stemmed from arguably unkept promises to other tribes following the *Scotts Valley I* remand. Consider the Yocha Dehe Tribe for instance. Yocha Dehe moved to intervene in Scotts Valley's lawsuit challenging the 2019 ILO. *See Scotts Valley Band of Pomo Indians v. Dep't of the Interior*, 337 F.R.D. 19, 21 (D.D.C. 2020). The tribe "argue[d] that the land at issue was the exclusive territory of its ancestors, the Patwin people, and that if Scotts Valley [wa]s permitted to develop the parcel, including by establishing a casino there, Yocha Dehe's existing nearby gaming facility w[ould] suffer severe injury, thereby harming the important tribal programs and cultural resources that depend upon casino revenue." *Id.* (cleaned up).

Judge Jackson denied Yocha Dehe's motion to intervene. *Id.* at 27. As the court reasoned, "Yocha Dehe submitted a considerable volume of material about its historical connection to the land when the question about Scotts Valley's association with the parcel was pending before the agency the first time, and it c[ould] do so again." *Id.* at 26. In defending that ruling on appeal, Interior argued that "Yocha Dehe w[ould] have additional opportunities to submit relevant information or views" after any potential remand to the agency. Federal Appellees' Final Response Brief at 17, *Yocha Dehe v. U.S. Dep't of the Interior*, 3 F.4th 427 (D.C. Cir. 2021) (No. 21-5009). Scotts Valley similarly told the D.C. Circuit that Interior would produce "a new analysis of the parcel's eligibility for gaming under [IGRA], addressing the same statutory and Part 292 criteria covered in the [2019 ILO] and responding to comments from

interested parties and the public." Final Brief of Appellee Scotts Valley Band of Pomo Indians at 35–36, *Yocha Dehe v. U.S. Dep't of the Interior*, 3 F.4th 427 (D.C. Cir. 2021) (No. 21-5009). The D.C. Circuit affirmed the denial of Yocha Dehe's motion to intervene. *Yocha Dehe v. U.S. Dep't of the Interior*, 3 F.4th 427, 428 (D.C. Cir. 2021).

Yet after the *Scotts Valley I* remand, Interior did not consider Yocha Dehe's—or any other tribe's—submissions before handing down the 2025 ILO. The 2025 ILO admitted as much. 2025 ILO at 3–4 (stating that Interior did not "consider[] any additional evidentiary materials from outside parties"). In Yocha Dehe's view, Interior's refusal to review its post-remand evidence not only departed from the agency's representation to the D.C. Circuit but also defied its post-remand assurances to the tribe. *See* Yocha Dehe June 2025 Letter, ECF No. 41-9, at 4 ("On November 27, 2024, Principal Deputy Assistant Secretary-Indian Affairs Wizipan Garriott . . . explicitly confirmed receipt of Yocha Dehe's submission and promised it would be carefully reviewed and considered as part of decision-making on Scotts Valley's restored lands request."). After the 2025 ILO's issuance, Yocha Dehe and three other tribes sued Interior—claiming, among other things, that Interior's "refusal to consider relevant evidence timely placed before [it] by Yocha Dehe, Kletsel Dehe, and other tribes and concerned parties violated the APA in multiple respects." *See Yocha Dehe Wintun Nation*, No. 25-cv-867, Compl., ECF No. 1, ¶ 145; *cf. Butte County v. Hogen*, 613 F.3d 190, 193–95 (D.C. Cir. 2010) (holding that Interior's restored lands determination was arbitrary and capricious where the agency declined to consider local county's submission disputing tribe's historical connection to the parcel).

Given this context, Scotts Valley has not shown that Interior failed to "cogently explain why it ha[d] exercised its discretion" to reconsider the 2025 ILO. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 48. "Agency explanations need not be elaborate or verbose . . . ." *Chiesi*

*USA, Inc. v. Kennedy*, 2025 WL 2466045, at *6 (D.D.C. Aug. 27, 2025). "Indeed, nothing more than a 'brief statement' is necessary," if "the agency explains 'why it chose to do what it did.'" *Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013) (quoting *Tourus Recs., Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001)). Interior sufficiently explained its basis for reconsideration by voicing its concerns over ignored third-party submissions and potential legal error—concerns of which Scotts Valley was well aware. Indeed, the Band had itself assured the Circuit that those third-party submissions would be considered. Nor has the Band demonstrated that Interior later "chang[ed] the stated scope of reconsideration" by asking third parties to resubmit their post-remand materials. *See* Compl. ¶ 165. There too, the agency likely acted within its discretion "[t]o ensure that [it] ha[d] all the relevant materials." *See* March 2025 Letter at 1. All told, Scotts Valley is unlikely to prevail on its claim that Interior's reconsideration was arbitrary and capricious.

**3.**

Scotts Valley's next claim also looks familiar. It asserts that the 2026 ILO "disregard[ed] the Band's serious reliance interests." Compl. ¶ 148; *see also* Mot. Prelim. Inj. at 39–45. For similar reasons as last time, the Band is unlikely to succeed on its reliance theory. *See Scotts Valley III*, 808 F. Supp. 3d at 20–23.

When an agency reverses course, it must "display awareness that it is changing position and show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (cleaned up). "In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* at 221–22 (cleaned up). "It would be arbitrary and capricious to ignore such matters." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up).

As the Court highlighted in *Scotts Valley III*, "[t]his strand of arbitrary-and-capricious doctrine does not set a high bar," "[n]or is that bar uniformly set across all contexts." 808 F. Supp. 3d at 22 (cleaned up). While "a cursory explanation" may be "inadequate" when dealing with "decades of industry reliance," *Kiewit Power Constructors Co. v. Sec'y of Lab.*, 959 F.3d 381, 399 (D.C. Cir. 2020) (cleaned up), "[a] summary discussion may suffice in other circumstances," *Encino Motorcars*, 579 U.S. at 222.

Against that backdrop, consider Scotts Valley's asserted reliance interests. According to the Band, the 2025 ILO "created substantial governmental, economic, regulatory, contractual, and property-based reliance interests." Compl. ¶ 145. "Among other things, the Band: (a) obtained acceptance of the Vallejo Site into trust for the primary purpose of conducting gaming; (b) obtained [National Indian Gaming Commission] approval of its gaming ordinance; (c) established a Tribal Gaming Commission and regulatory infrastructure; (d) entered into agreements with the City of Vallejo; (e) developed and licensed a Class II gaming facility; (f) hired and trained Tribal employees and gaming regulators; (g) entered into leases and other contractual obligations; (h) invested more than $10 million in the facility and related infrastructure; and (i) commenced gaming operations in reliance on the January 2025 [ILO]." *Id.*

Those reliance interests do not make Scotts Valley likely to succeed on its APA claim. At the outset, some of the interests duplicate those in *Scotts Valley III*. At that juncture, the Band had already "authorized the payment of millions of dollars in project related expenses, signed an agreement to reimburse the City of Vallejo's costs to evaluate and analyze potential impacts of the Tribe's development, and amended its gaming ordinance and obtained NIGC approval." *Scotts Valley III*, 808 F. Supp. 3d at 22 (cleaned up). Then as now, those actions are not enough to sustain the Band's reliance claim.

More, the Band's post-*Scotts Valley III* reliance interests are "tempered by substantial concerns for legal or political jeopardy." *See Mozilla Corp. v. FCC*, 940 F.3d 1, 64 (D.C. Cir. 2019) (per curiam). To count toward an APA claim, reliance interests must be "reasonably incurred." *Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020). Reliance is unreasonable when an issue has long "been disputed," thus shrouding the plaintiff's actions in "considerable [legal] uncertainty." *See Bell Atl. Tel. Cos. v. FCC*, 79 F.3d 1195, 1207 (D.C. Cir. 1996); *see also Voyageur Outward Bound Sch. v. United States*, 444 F. Supp. 3d 182, 196 (D.D.C. 2020) (holding that "[p]laintiffs unreasonably relied on a decision actively being challenged by [a third party] in court"), *opinion vacated, appeal dismissed*, 2022 WL 829754 (D.C. Cir. Mar. 17, 2022). By that same token, reliance interests count less when the relied-upon agency decision "might soon be reversed." *See Mozilla Corp.*, 940 F.3d at 64.

Those principles lessen Scotts Valley's reasonable reliance interests. After the Court vacated the 2025 ILO's rescission in *Scotts Valley III*, the 2025 ILO—though temporarily restored—still faced legal peril. As the Court spelled out, its decision "d[id] not bar Interior from continuing its reconsideration, nor d[id] it stop the Department from revoking the Band's gaming eligibility at the end of that process." *Scotts Valley III*, 808 F. Supp. 3d at 28. Recognizing the reconsideration process's likely result, the Court cautioned that "Scotts Valley would be ill-served by placing undue reliance on [the Court's] decision." *Id.* Roughly one month after *Scotts Valley III*, Interior, too, advised the Band that it would continue its reconsideration, echoing the Court's warning about "undue reliance." December 2025 Letter at 1 (cleaned up). And aside from undergoing active reconsideration, the 2025 ILO was also still overshadowed by the neighboring tribes' three lawsuits. *See supra* Part I.

Although the Court does not hold that Scotts Valley's reliance on the legally effective 2025 ILO was wholly unreasonable, the "considerable uncertainty" about the 2025 ILO's future warranted caution. *See Bell Atl. Tel. Cos.*, 79 F.3d at 1207. And even setting aside the legal peril they faced, the Band's interests do not amount to the "society- and industry-wide reliance on longstanding policies" that would require a lengthy explanation. *See Scotts Valley III*, 808 F. Supp. 3d at 22–23; *see also* Mot. Prelim. Inj. at 43 ("The Band does not contend that seven months of post-[*Scotts Valley III*] reliance is equivalent in duration to the decades of industry reliance present in *Encino Motorcars*.").

Given the reliance interests at stake, Scotts Valley has not shown that Interior addressed them inadequately. Instead, the agency showed that it was "cognizant" of the Band's reliance. *See Encino Motorcars*, 579 U.S. at 221–22 (cleaned up). Interior repeatedly warned Scotts Valley not to rely on the 2025 ILO while reconsideration was ongoing. *See* March 2025 Letter at 1; December 2025 Letter at 1; *cf. MediNatura, Inc. v. FDA*, 998 F.3d 931, 942 (D.C. Cir. 2021) (considering agency's response to reliance interests "during the development" of the agency action (cleaned up)). In the 2026 ILO, Interior repeated *Scotts Valley III*'s warning about "undue reliance." 2026 ILO at 3 (cleaned up). As summarized above, the 39-page document then explained why the new evidence justified reversing the 2025 ILO despite any reliance. *See id.* at 4–39. Under these circumstances, the APA likely demanded nothing more. *See MediNatura*, 998 F.3d at 942–43 (upholding FDA's withdrawal of 30-year enforcement guidance on homeopathic drugs where the agency gave a one-paragraph explanation). Like last time, "Scotts Valley's theory would break new ground, and the caselaw does not warrant that move." *See Scotts Valley III*, 808 F. Supp. 3d at 23. Especially in this preliminary posture.

**4.**

For its final claim, Scotts Valley returns to the well of due process. Compl. ¶¶ 169–83; Mot. Prelim. Inj. at 37–39. On the last go-around, this Court ruled "that the Band's gaming eligibility was a protected property interest and that Interior provided too little process to rescind it." *Scotts Valley III*, 808 F. Supp. 3d at 23. The Band is unlikely to recreate that success here.

The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). "Only after finding the deprivation of a protected interest do [courts] look to see if the government's procedures comport[ed] with due process." *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) (cleaned up).

If the plaintiff shows a deprivation of a protected interest, due process requires "notice and [an] opportunity for [a] hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (cleaned up). Constitutionally adequate notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 599 (D.C. Cir. 1993) (cleaned up). "[D]ue process requires, at the least, that an affected party be informed of the official action, be given access to the . . . evidence on which the official actor relied and be afforded an opportunity to rebut that evidence." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 319 (D.C. Cir. 2014).

Scotts Valley's latest due-process claim targets the reconsideration process. The Band contends that Interior "failed to provide the Band adequate notice of the specific basis for its decision to reopen the 2025 [ILO], and failed to give the Band a meaningful opportunity to present its objections to that course of action." Mot. Prelim. Inj. at 38. Scotts Valley also sees a due-process violation in the agency's decision to "alter[] its reconsideration procedure by excluding all pre-January 10, 2025, submissions unless they were resubmitted," which supposedly "augured a new and different reason for reconsidering the matter." *Id.* According to the Band, Interior "again failed to provide adequate notice of the specific reasons for this new rationale or a meaningful opportunity to respond to such rationale." *Id.*

Scotts Valley is unlikely to succeed on this claim for two reasons.

The first flaw lies in the Band's focus on the reconsideration process. Remember that "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 59. In *Scotts Valley III*, the Court held that the Band's rescinded gaming eligibility was a protected due-process interest. 808 F. Supp. 3d at 23. By contrast, Interior's bare decision to reconsider did not take away Scotts Valley's gaming eligibility, which means that the Band's present challenge does not involve "the deprivation of a protected interest." *See Gen. Elec. Co.*, 610 F.3d at 117 (cleaned up). To be sure, the 2026 ILO's restored lands decision amounts to a deprivation, but the Band does not contend that it lacked opportunity to argue its case for gaming eligibility. *See* Mot. Prelim. Inj. at 37–39. As framed here, Scotts Valley's due-process claim takes issue with the reconsideration process itself without identifying a protected interest that the process deprived. That claim runs headlong into the longstanding maxim that plaintiffs "do[] not have a constitutionally protected interest in having [an agency] adhere to its procedural requirements."

*See Brandon v. D.C. Bd. of Parole*, 823 F.2d 644, 649 (D.C. Cir. 1987); *see also Antidote Health Plan of Ariz., Inc. v. Becerra*, 754 F. Supp. 3d 219, 230 (D.D.C. 2024) (rejecting plaintiff's effort to "claim[] a[] [due-process] entitlement to the [agency's] reconsideration *process*" because that "would equate the process due with the substantive interest at stake" (cleaned up)). Scotts Valley's refashioned due-process claim is unlikely to work.

Even if the Band possessed a protected interest in not undergoing reconsideration itself, Interior still satisfied due process's demands. Interior timely informed the Band of its decision to reconsider the 2025 ILO less than 11 weeks after its issuance. *See Scotts Valley III*, 808 F. Supp. 3d at 18. At the start of the reconsideration process, Interior communicated its "concern[] that the Department did not consider additional evidence submitted after the 2022 Remand." March 2025 Letter at 1. The agency later reiterated "that not taking those submissions into consideration in this particular case could be deemed legal error." December 2025 Letter at 1. Interior also told the Band what those submissions were about: "whether the Vallejo Site qualifies as restored lands under 25 U.S.C. § 2719(b)(l)(B)(iii) and 25 C.F.R. Part 292." March 2025 Letter at 1. And Scotts Valley knew that other tribes like Yocha Dehe had submitted those materials and were suing Interior over its refusal to consider them. *See supra* Part III.A.2. Interior's notice to the Band thus was "reasonably calculated, under all the circumstances, to apprise [it] of the pendency of the [reconsideration]." *See Reeve Aleutian Airways*, 982 F.2d at 599 (cleaned up).

After this Court's due-process ruling in *Scotts Valley III*, the Band also had ample "opportunity to present [its] objections." *See id.* (cleaned up). Interior gave Scotts Valley all the "evidence and legal analysis" that other tribes and stakeholders had resubmitted. 2026 ILO at 3 (cleaned up). The agency then twice "discussed a time frame for reconsideration with the Band,"

allowing Scotts Valley to respond almost five months after it received the submissions. *Id.* Interior then met in person with the Band, "at which meeting the Band presented its response to the June 2025 Submissions." *Id.* at 3–4 (footnote omitted). Scotts Valley's final response consisted of five new expert reports, a 66-page memorandum of law, hundreds of pages of new exhibits, and an eight-minute video. *See* Adams Decl., ECF No. 41-1, ¶ 14. The Band's memorandum devoted two sections to challenging the necessity of reconsideration. *See* Scotts Valley Mem., ECF No. 43-6, at 14–17. After receiving Scotts Valley's response, Interior "accepted no further submissions." 2026 ILO at 4.

The Band has not shown that this process was insufficient. Instead, the record suggests that Scotts Valley was "informed of the official action," "given access to the . . . evidence on which [Interior] relied," and was "afforded an opportunity to rebut that evidence." *See Ralls Corp.*, 758 F.3d at 319. Nor is there likely merit to the Band's assertion that Interior unlawfully "altered its reconsideration procedure by excluding all pre-January 10, 2025, submissions unless they were resubmitted." Mot. Prelim. Inj. at 38. As Interior clarified to Scotts Valley in giving it the five-month response period, the agency asked for resubmission "to gather all the evidence that may not have been considered in reaching the 2025 Gaming Eligibility Determination." January 2026 Letter, ECF No. 10-10, at 1. And the resubmission "allow[ed] [the Band] to narrow the focus of [its] response." *Id.* Scotts Valley had plenty of time to deliver its lengthy response, and it had the last word. That last word included a high-level, in-person meeting, numerous reports and exhibits, and a short film. The Band is unlikely to show a due-process violation.

* * *

Scotts Valley falters on all four counts. The Band has not demonstrated likely success on its claim that the 2026 ILO defied *Scotts Valley I*, that Interior inadequately justified its decision to reconsider the 2025 ILO, that the agency disregarded its reliance interests, or that Interior violated due process. Scotts Valley's "failure to show a likelihood of success on the merits alone is sufficient to defeat [its] preliminary-injunction motion." *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (citing *Ark. Dairy Co-op Ass'n, Inc. v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009)). The other factors only underline that defeat. The Court turns to them now.

**B.**

When Scotts Valley last moved for injunctive relief, the Court denied its motion solely because of the lack of irreparable harm. *Scotts Valley II*, 2025 WL 1639901, at *1. Although the Band has since pressed on with its casino plans, it comes up short on irreparable harm yet again.

Binding precedent sets "a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). To amount to irreparable harm, "[t]he injury must be both certain and great; it must be actual and not theoretical and of such imminence that there is a clear and present need for equitable relief." *Olu-Cole*, 930 F.3d at 529 (cleaned up). The injury must also "be beyond remediation." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (cleaned up).

As in its previous motion for preliminary relief, the Band puts forward two kinds of harm: economic and sovereign.[2] *See Scotts Valley II*, 2025 WL 1639901, at *3; Mot. Prelim. Inj. at 45–50. Neither cuts the mustard.

**1.**

Start with economic harm, where the uphill slope is even steeper than elsewhere. "Where the injuries alleged are purely financial or economic, the barrier to proving irreparable injury is higher still, for it is well settled that economic loss does not, in and of itself, constitute irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cleaned up). "Financial injury is only irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Id.* To count as irreparable, then, the loss must "threaten[] the very existence of the movant's business." *Wis. Gas Co.*, 758 F.2d at 674.

Scotts Valley's claimed economic harm flows from the forced "[c]losure of the Preview Casino," which "immediately eliminated the gaming revenue that the Band intended to use to support the facility." Davis Decl. ¶ 54. The Band asserts that its "total investment in the Preview Casino exceeds $10 million." Mot. Prelim. Inj. at 48; *see also* Davis Decl. Ex. A, ECF No. 10-3 (table providing claimed expenses). According to the Band, "[t]his figure represents unrecoverable sunk costs for the use of class II gaming devices, the placement, structural improvement, and outfitting of buildings for the Preview Casino, construction and improvement of the facility's landscaping, driveway and parking area, and the hiring and training of casino

[2] The Band also claims irreparable harm from Interior's alleged due-process violation. Mot. Prelim. Inj. at 46. Because the Band is unsuccessful in its due-process claim, *supra* Part III.A.4, it suffers no constitutional irreparable harm. *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009).

employees and the members and staff of the Tribal Gaming Commission." Mot. Prelim. Inj. at 49. Scotts Valley states that "[a]ll of these costs were incurred while the January 2025 restored lands decision was in effect," and "[t]he facility's premature closure prevents the Band from recouping the[m]." *Id.*

"Even while the Preview Casino remains closed," the Band maintains, "approximately $235,247 in expenses and obligations are incurred each month to preserve the facility and the governmental and operational infrastructure necessary to resume gaming." Davis Decl. ¶ 54. "Those continuing monthly expenses include approximately $59,081 for employees; $40,500 for security; $50,167 attributable to obligations under the Band's agreement with the City of Vallejo; $68,000 for trailer and generator rental and fuel; and $17,500 for the Tribal Gaming Commission, including its Executive Director and Commissioners." *Id.* ¶ 55. And "[c]ontinued closure will also deprive the Band of gaming revenues needed to support Tribal governmental operations, delay the development of the planned Class III gaming facility, and result in the loss of community goodwill, operational momentum, and valuable regulatory and operational experience that cannot readily be recreated." Mot. Prelim. Inj. at 49.

Though greater than last year, the Band's economic harm still is not irreparable. Similar to *Scotts Valley II*, at least some of the Band's costs are deductible or insufficiently corroborated. *See Scotts Valley II*, 2025 WL 1639901, at *3–4. Scotts Valley's cost table labels more than $2 million in expenses simply as "Admin Office," without offering further detail. *See* Davis Decl. Ex. A at 1. Worse, the table lists more than $1.5 million of those "Admin Office" costs as occurring the month before or on October 30, 2025—the day the Court issued *Scotts Valley III*. That sum thus was not "incurred while the January 2025 restored lands decision was in effect." *See* Mot. Prelim. Inj. at 49. The rest of Scotts Valley's cost summary is only slightly more

detailed. Under the banner of "Other Purchases as of 7.31," for example, it claims more than $4 million, providing curt descriptions like "Klas Robinson" ($48,789), "Habitat Credits" ($168,000), and "MOU Commitment" ($1,506,000). Davis Decl. Ex. A at 3–4. This showing does not meet the high "degree of proof required for irreparable harm." *See Olu-Cole*, 930 F.3d at 529 (cleaned up).

Even if taken at face value, Scotts Valley's economic harm would still not justify a preliminary injunction. That is for one main reason: The Band has not established that any of its monetary losses "threaten[] the very existence of [its] business." *See Wis. Gas Co.*, 758 F.2d at 674. Without that showing, Scotts Valley cannot surmount the even higher "barrier to proving irreparable injury" through economic harm. *See Mexichem Specialty Resins*, 787 F.3d at 555.

Not being able to immediately recover the $10 million investment into the Preview Casino does not threaten to destroy the Band's business. In fact, by Scotts Valley's own admission, the $10 million sum is "sunk cost[]." Mot. Prelim. Inj. at 49. For that expense, the Band thus fails to show that "no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *See Mexichem Specialty Resins*, 787 F.3d at 555 (cleaned up); *see also, e.g.*, *Morgan Drexen, Inc. v. CFPB*, 979 F. Supp. 2d 104, 112 (D.D.C. 2013) (ruling that "any previous harm . . . is not properly remedied by prospective injunctive relief absent a showing that the harm is likely to recur"), *aff'd*, 785 F.3d 684 (D.C. Cir. 2015). Without more, the $10 million figure looks like ordinary economic loss, which "does not, in and of itself, constitute irreparable harm." *See Mexichem Specialty Resins*, 787 F.3d at 555 (cleaned up).

Nor does Scotts Valley meet the mark with the claimed $235,247 per month to maintain its casino and "the governmental and operational infrastructure necessary to resume gaming."

*See* Davis Decl. ¶ 54. Once again, the threat to the movant's business must be "of such imminence that there is a clear and present need for equitable relief." *See Olu-Cole*, 930 F.3d at 529 (cleaned up). The Band does not make that showing—even if the Court accepts Scotts Valley's questionable claim that it takes $235,247 per month to maintain two modular buildings with 17 class II gaming machines. *See* Mot. Hr'g Tr. at 11:3–12. At the motion hearing, Scotts Valley's counsel predicted that "[a]t some point, the preservation costs are going to outweigh the costs of dismantling the facility." *Id.* at 5:25–6:1. But he admitted that "we don't have a date for that yet," asserting instead that "th[is] day may come." *Id.* at 6:1–3. That is not enough to prove imminent irreparable harm. *See Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 51–52 (D.D.C. 2011) (finding no irreparable harm even where company claimed that it lost $6.7 million in revenue, that it "laid off five of its twenty-eight employees," that it would "likely need to lay off more employees and sell equipment to lower its costs and loan debt in the very near future," and that it "would be forced out of business in eighteen months" (cleaned up)).

The final flaw in Scotts Valley's claim of economic harm is that it was largely avoidable. "It is well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (cleaned up); *accord Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Nat'l Mediation Bd.*, 502 F. Supp. 3d 180, 193 (D.D.C. 2020) (same). In its push to set up and open the Preview Casino one week before Interior's announced deadline for the 2026 ILO, the Band knew that its gaming eligibility was on shaky ground—not least because this Court warned Scotts Valley against unduly relying on its decision. *See Scotts Valley III*, 808 F. Supp. 3d at 28. Scotts Valley rolled the dice and invested anyway, which makes its economic harm self-inflicted. To be sure, one decision in this district has ruled that harm is self-inflicted

only if "curable by the moving party without an injunction." *See District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 35 (D.D.C. 2020). But even under that standard, the Band could have avoided sinking $10 million into a casino project that it knew was in serious legal jeopardy. Ultimately, Scotts Valley has "suffered the most from [its] own actions." *See Barton v. District of Columbia*, 131 F. Supp. 2d 236, 247 (D.D.C. 2001). That reality cements the Band's failure to justify a preliminary injunction via economic harm.

**2.**

Next to economic loss, Scotts Valley also asserts sovereign harm. Mot. Prelim. Inj. at 46–48. "Until the 2026 [ILO], the Band possessed the sovereign authority to regulate class II gaming on the Vallejo Site." *Id.* at 46. The Band exercised that authority when operating the Preview Casino. *See id.* at 47–48. By revoking the parcel's gaming eligibility, Scotts Valley contends, Interior "immediately terminate[d] the Band's governmental power over class II gaming." *Id.* at 46. On top of that inability to regulate, Scotts Valley also points to three other "interrelated governmental activities that were harmed by" the 2026 ILO: the Band's "use of the land" for gaming, the Band's employment of its members in the casino, and its "intergovernmental relationships with the City of Vallejo." Mot. Hr'g Tr. at 9:2–10:14; *see also* Mot. Prelim. Inj. at 46–48.

Once again, the Court recognizes that the Band has made headway since *Scotts Valley II*. Though briefly and on a small scale, the Band ran a class II gaming operation on the parcel. The Court also assumes that the Band's loss of regulatory authority is not self-inflicted because that outcome is unavoidable "without an injunction." *See Dep't of Agric.*, 444 F. Supp. 3d at 35.

And yet, the Band's claimed sovereign harm is not enough. Even today, it remains true that "any sovereignty change has not produced the type of actual, tangible harm that the D.C. Circuit requires." *See Scotts Valley II*, 2025 WL 1639901, at *6 (cleaned up).

The Circuit has emphasized that not all incursions on an Indian tribe's sovereignty are equally grave. As it explained in *San Manuel Indian Bingo & Casino v. NLRB*, 475 F.3d 1306 (D.C. Cir. 2007), "[a]n examination of Supreme Court cases shows tribal sovereignty to be at its strongest when explicitly established by a treaty . . . or when a tribal government acts within the borders of its reservation, in a matter of concern only to members of the tribe." *Id.* at 1312 (citations omitted). "Examples of such intramural matters include regulating the status of tribe members in relation to one another . . . and determining tribe membership." *Id.* (citations omitted). By contrast, the D.C. Circuit ruled that "when a tribal government goes beyond matters of internal self-governance and enters into off-reservation business transaction[s] with non-Indians, its claim of sovereignty is at its weakest." *Id.* at 1312–13. As the court also recognized, "[m]any activities of a tribal government fall somewhere between a purely intramural act of reservation governance and an off-reservation commercial enterprise." *Id.* at 1313. In those cases, the incursion on tribal sovereignty equals the degree to which the challenged action "will constrain the tribe with respect to its governmental functions." *Id.*

The Circuit applied those principles to a tribe's casino operations. *Id.* at 1314. As the court acknowledged, "in establishing and operating the Casino, San Manuel ha[d] not acted solely in a commercial capacity." *Id.* After all, the tribe's "enactment of a tribal labor ordinance to govern relations with its employees was a governmental act, as was its act of negotiating and executing a gaming compact with the State of California." *Id.* "Nevertheless," the Circuit concluded, "impairment of tribal sovereignty [wa]s negligible in this context, as the Tribe's

activity was primarily commercial and its enactment of labor legislation and its execution of a gaming compact were ancillary to that commercial activity." *Id.* at 1315. In the *San Manuel* court's eyes, the sovereign harm ultimately "amount[ed] to some unpredictable, but probably modest, effect on tribal revenue and the displacement of legislative and executive authority that is secondary to a commercial undertaking." *Id.* To the Circuit, that "limited" harm did not warrant "a restrictive construction of the [National Labor Relations Act]." *Id.*

This distinction shows why Scotts Valley's claimed sovereign harm is not enough. As in *San Manuel*, the Band's injuries fall outside the core of sovereignty and are instead "ancillary to th[e] commercial activity" of running a casino. *See id.* That fact once again distinguishes *Mashpee Wampanoag Tribe v. Bernhardt*, 2020 WL 3034854 (D.D.C. June 5, 2020), which remains Scotts Valley's best case in this setting. *See* Mot. Prelim. Inj. at 48. In that case, the federal government took the tribe's land out of trust, wholly extinguishing "its sovereignty over the land," and thereby also taking away the tribe's "right to self-governance" and "its eligibility for a variety of federal programs and funding including COVID relief." *Mashpee Wampanoag Tribe*, 2020 WL 3034854, at *3. As before, "[t]his context is readily distinguishable from the current situation," mainly because the Band's land remains in trust. *See Scotts Valley II*, 2025 WL 1639901, at *8. Instead, this case resembles *Cow Creek Band of Umpqua Tribe of Indians v. Department of the Interior*, 2025 WL 548316 (D.D.C. Feb. 19, 2025), where the plaintiff tribes similarly failed to "describe[] in any detail how potential near-term revenue losses [from gaming] would concretely affect any program or service." *See id.* at *4. Irreparable harm demands more.

* * *

Neither the Band's economic loss nor its sovereign harm satisfies the Circuit's "high standard for irreparable injury." *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. That failure is fatal.

**C.**

If that were still not enough, Scotts Valley must also show "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. That is because "the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). And "[i]n assessing these factors, courts consider the impacts of the injunction on nonparties as well." *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 84 (D.D.C. 2020). Here, the equities and public interest weigh decisively against preliminary relief.

Scotts Valley addresses these factors briskly. *See* Mot. Prelim. Inj. at 50–51. The Band contends that they weigh in its favor because it "faces immediate and concrete harms to its due process rights, gaming rights, sovereign authority, economic development efforts, and government-to-government relationships." *Id.* at 50. Despite the Band's curt briefing, the Court recognizes its interest in a favorable ILO, especially after its ten-year quest to obtain it. As before, the Court credits Scotts Valley's claim that "gaming on the Vallejo parcel would rejuvenate the long landless tribe's governmental operations and economic development." *Scotts Valley III*, 808 F. Supp. 3d at 25 (cleaned up).

The problem for the Band is that several other sovereigns have genuine concerns counseling against a preliminary injunction. The first (of course) is the federal government, or Interior, which continues to "ha[ve] an interest in reaching the right gaming decision because a

Vallejo casino would have substantial social and economic effects, especially on the neighboring tribes." *See id.* at 26; *see also Dun & Bradstreet Corp. Found. v. USPS*, 946 F.2d 189, 194 (2d Cir. 1991) (recognizing "the general public interest in attaining the correct result in administrative cases"). Reinstating the 2025 ILO despite Interior's deliberate—and thoroughly reasoned—decision to revoke it would impair the federal government's interest.

Scotts Valley's home state also advocates against preliminary relief. In his amicus brief, Governor Gavin Newsom contends that "[t]he proposed preliminary injunction threatens to harm California and its Governor, and the public interests that they represent." Governor Newsom Amicus Br., ECF No. 38, at 4. "In particular," the Governor explains, "a preliminary injunction threatens to coerce California and its Governor into compact negotiations; expose them to new litigation risk; and undermine their bargaining position, given . . . the unprecedented uncertainty surrounding the gaming eligibility of the Vallejo site." *Id.* The Governor also reiterates his general "oppos[ition] [to] the U.S. Department of the Interior's invocation of IGRA's 'restored lands' exception to render the Vallejo site gaming-eligible." *Id.* at 5 n.1. Consistent with that opposition, the Governor emphasizes that "despite the Scotts Valley Band's contrary implication, the two sides are *not* near consensus in [class III] compact negotiations." *Id.* at 6.

Finally, there are the four neighboring tribes, all of whom vehemently oppose Scotts Valley's casino plans and its bid for preliminary relief. *See* Lytton Rancheria Amicus Br., ECF No. 39, at 5–6; United Auburn Amicus Br., ECF No. 40, at 6; Patwin Tribes Amicus Br., ECF No. 41, at 6. According to the United Auburn Indian Community, for example, "[t]he record already demonstrates that Scotts Valley's proposed off-reservation project would compete directly with [the tribe's] existing on-reservation tribal gaming operations." United Auburn Amicus Br. at 21. Meanwhile, the two Patwin tribes (Yocha Dehe and Kletsel Dehe) also assert

cultural harm. They maintain "that the Vallejo Property lies within Patwin ancestral lands," which "are not just an important part of Patwin history, but also an integral and continuing part of Patwin cultural identity." Patwin Tribes Amicus Br. at 27. "This is a matter of critical importance to Yocha Dehe and Kletsel Dehe, whose ancestors and culture were almost completely erased by government policies during the late nineteenth and early twentieth centuries." *Id.* According to the Patwin tribes, restoring the 2025 ILO would "renew that process of erasure, causing a deep cultural injury that transcends the harm associated with a non-tribal land dispute." *Id.*

* * *

Several sovereigns explain why a preliminary injunction would harm the constituencies they represent. Restoring the 2025 ILO (even temporarily) would displace the federal government's thoroughly reasoned decision on gaming eligibility, push California into negotiating a casino expansion that it opposes, and injure both the economic and cultural interests of multiple neighboring tribes. Although the Band has an interest in realizing its gaming plans, that interest does not tilt the balance in favor of the extraordinary relief that it seeks. Indeed, this final factor weighs especially strongly against an injunction given the concerns raised by amici.

**IV.**

In sum, the Court holds that Scotts Valley has not carried its heavy burden to obtain a preliminary injunction. The Band fails to show likelihood of success on any of its four claims: that Interior infringed *Scotts Valley I*'s remand order, that it improperly justified its reconsideration, that the agency ignored the Band's reliance interests, and that Interior violated the Band's due-process rights. Nor has Scotts Valley established irreparable harm with either its

economic or sovereign injuries. Finally, the equities and public interest oppose a preliminary injunction for the Band. "[A] preliminary injunction is an extraordinary and drastic remedy . . . ." *Mazurek*, 520 U.S. at 972 (cleaned up). None is warranted here.

For these reasons, it is hereby

**ORDERED** that Scotts Valley's [10] Motion for Preliminary Injunction is **DENIED**.

2026.09.30 14:25:00 -04'00'

Dated: September 30, 2026

TREVOR N. McFADDEN
United States District Judge